642 A.2d 338

BELINDA MURRAY AND ELRICK A. MURRAY, M.D., PLAIN-
TIFFS–RESPONDENTS, v. MICHAEL ANDREW LAWSON,
DAVID CRIST, JANE DOE (A FICTITIOUS NAME) AND JOHN
DOE (A FICTITIOUS NAME), DEFENDANTS–APPELLANTS.

VIRGINIA BOFFARD AND DARYL K. BOFFARD, M.D., PLAIN-
TIFFS–RESPONDENTS, v. TIMOTHY BARNES, DOROTHY
BLACK, CAROL FORD, BARBARA CARLSTROM, JANE DOE (A
FICTITIOUS NAME) AND JOHN DOE (A FICTITIOUS NAME),
DEFENDANTS–APPELLANTS.

Argued October 25, 1993—Decided April 6, 1994.

*Richard F. Collier* argued the cause for appellants Michael Andrew Lawson, David Crist, Jane Doe and John Doe.

*Michael Patrick Carroll* argued the cause for appellants Timothy Barnes, Dorothy Black, Carol Ford, and Barbara Carlstrom (*Mr. Carroll* and *Richard J. Traynor*, attorneys).

*Pamela Mandel* argued the cause for respondents Belinda Murray and Elrick A. Murray, M.D., Virginia Boffard and Daryl K. Boffard, M.D.

*Frank L. Corrado* argued the cause for *amicus curiae* American Civil Liberties Union of New Jersey in *Murray v. Lawson* and *Boffard v. Barnes* (*Barry & Corrado* and *Lisa Glick Zucker*, attorneys).

*Dara Klassel*, a member of the New Jersey and New York bars, argued the cause for *amici curiae* Planned Parenthood Federation of America and Planned Parenthood Affiliates of New Jersey in *Murray v. Lawson* and *Boffard v. Barnes* (*Ansell, Zaro, Bennett and Grimm*, attorneys; *Ms. Klassel* and *Richard B. Ansell*, on the brief).

*Charles J. Walsh* argued the cause for *amicus curiae* The American College of Obstetricians and Gynecologists in *Murray v. Lawson* and *Boffard v. Barnes* (*Sills, Cummis, Zuckerman, Radin, Tischman, Epstein & Gross*, attorneys; *Mr. Walsh* and *Steven R. Rowland*, of counsel and on the brief).

*Andrea M. Silkowitz*, Assistant Attorney General, argued the cause for *amicus curiae* Attorney General of New Jersey (*Fred DeVesa*, Acting Attorney General, attorney; *Jack M. Sabatino*, Assistant Attorney General, of counsel).

The opinion of the Court was delivered by

CLIFFORD, J.

These cases, argued together before this Court, require a balance between the free-speech rights of anti-abortion protestors and the residential-privacy interests of two doctors and their families. In *Murray v. Lawson*, the Appellate Division upheld a permanent injunction by the Chancery Division prohibiting defendants, anti-abortion protestors, from picketing within 300 feet of plaintiffs' residence. 264 *N.J.Super.* 17, 624 *A.2d* 3 (1993). In

*Boffard v. Barnes,* the same panel of the Appellate Division upheld a Chancery Division restriction forbidding defendants, anti-abortion protestors, from picketing within the immediate vicinity of plaintiffs' residence. 264 *N.J.Super.* 11, 624 *A.*2d 1 (1993). Defendants in both cases petitioned this Court. We granted certification, 133 *N.J.* 445, 627 *A.*2d 1149 (1993), and 133 *N.J.* 446, 627 *A.*2d 1150 (1993), to address the problems inherent in balancing free speech with residential privacy.

We now affirm the Appellate Division's judgment upholding the *Murray* injunction. We modify the judgment of the Appellate Division in *Boffard* and remand to the Chancery Division for a clarification of the restrictions contained in its injunction.

## I

### A. *Murray v. Lawson*

The facts are as set forth in the Appellate Division opinion, to which we make reference as necessary.

Plaintiff Dr. Elrick Murray is a New Jersey-licensed obstetrician and gynecologist with a private practice in Plainfield. Dr. Murray does not perform abortions at that office. He does, however, perform abortions at the Women's Medical Center in Howell, and at hospitals in Newark and in Watchung. 264 *N.J.Super.* at 22, 624 *A.*2d 3. He also performed abortions at the Medical Care Center in Woodbridge before that facility burned to the ground. *Id.* at 24, 624 *A.*2d 3. Dr. Murray and his wife, plaintiff Belinda Murray, live with their three children in Westfield in a suburban neighborhood. In 1991 the children were ages six, eleven, and fifteen. *Id.* at 22, 624 *A.*2d 3. Defendants regularly demonstrated against abortion by picketing at the Howell Clinic for about two years before January 1991. *Id.* at 23, 624 *A.*2d 3.

By engaging in some research in December 1990, defendant Lawson uncovered Plainfield and Westfield addresses for Dr. Murray. Lawson visited both addresses to confirm that they were

current. On December 14, 1990, when he went to the Westfield address, Lawson was surprised to find a residence and not an office. When Lawson rang the doorbell, plaintiffs' then-fourteen-year-old son answered the door. After confirming that the house was the Murray residence, Lawson told the boy to relay a message to his father to stop doing abortions. Mrs. Murray came to the door and told Lawson to leave and not return. Lawson left immediately. Mrs. Murray testified that Lawson's visit had frightened and upset her. *Ibid.*

About a month later, Lawson informed the Westfield police that he and approximately fifty other people planned to picket peacefully outside the Murray residence on Sunday, January 20, 1991. The administrator of the Medical Care Center in Woodbridge warned Dr. Murray about the Sunday protest. On the advice of the Westfield police, Dr. Murray sent his family away for the day but he remained inside the house himself. *Ibid.* Dr. Murray testified that he would have preferred to go to the hospital that day instead because two of his patients were in labor. *Id.* at 24, 624 *A.*2d 3.

On the afternoon of January 20 two police officers met the fifty-seven picketers at a nearby school, instructed them on basic picketing rules, and escorted them to the sidewalk in front of the Murray residence. *Id.* at 23, 624 *A.*2d 3. The picketers walked in a single-file loop on the sidewalk in front of the Murray residence and in front of about ten surrounding houses. Defendants walked generally two abreast but sometimes four or five abreast. *Ibid.* The picketers carried placards that stated, among other things, "Dr. Murray scars women and kills their unborn children," "Elrick Murray pre-born baby exterminator and nomad abortionist," and they carried a placard that showed a decapitated infant with the caption "Elrick Murray, abortionist." *Id.* at 23–24, 624 *A.*2d 3. The picketers spoke to several neighbors including one teenager whom they asked whether he knew that a killer lived in the neighborhood. *Id.* at 23, 624 *A.*2d 3.

Plaintiffs testified that the demonstration had the following effects: (1) it deprived the Murrays of their usual Sunday family time; (2) it harmed Dr. Murray's ability to practice medicine because he was forced to remain home to manage his patients in labor in lieu of managing them at the hospital; (3) it caused Dr. Murray to curtail his professional work because he felt compelled to stay home more often; and (4) it caused Mrs. Murray to suffer from nervousness and depression. *Id.* at 24, 624 *A.*2d 3.

In February 1991 plaintiffs filed suit in the Chancery Division seeking damages and injunctive relief against defendants, Lawson, Crist, and fictitiously-named others. The five-count complaint charged Lawson with trespass and charged all defendants with disruption of plaintiffs' use and enjoyment of their property, intrusion on their seclusion, damage to Dr. Murray's professional reputation and pecuniary interests, and deprivation of the right to privacy under the United States and the New Jersey Constitutions. *Id.* at 21, 624 *A.*2d 3. On February 8, 1991, the first scheduled hearing date of the case, defendants Lawson and Crist picketed for about fifteen minutes on the sidewalk in front of plaintiffs' residence and in front of other residences on the block. *Id.* at 24, 624 *A.*2d 3.

After a hearing on February 14, 1991, the Chancery Division entered a temporary restraining order on February 22, restricting the picketers from using the words "murderer" or "killer," from referring to members of the Murray family by name, from carrying the sign with the decapitated fetus, and from hand-delivering written material to residents of the neighborhood. In addition, the order limited defendants' demonstrating to picketing by two persons, for one hour, every three weeks. *Id.* at 21 n. 1, 624 *A.*2d 3.

No demonstrators picketed at the Murray residence until May 4, 1991. In the interim, however, on April 22, 1991, Dr. Murray discovered on arriving for work at the Medical Care Center in Woodbridge that the building had burned to the ground. Police and fire officials concluded that the fire had been the product of an

arsonist. *Ibid.* Defendant Lawson picketed at the Howell clinic and at Dr. Murray's Plainfield office once between April 22 and May 4, 1991. On May 2, 1991, Howell Township police received a telephone message threatening the bombing of the Howell clinic, whereupon the police evacuated the site. *Id.* at 24–25, 624 *A.*2d 3. Authorities never determined conclusively who was responsible for the fire at the Woodbridge clinic or for the bomb threat to the Howell clinic.

Two days after the bomb threat, on May 4, 1991, Lawson and another picketer reappeared to protest in front of the Murray residence. Dr. Murray called the police. After they had arrived in response to his call, the doctor went outside and exchanged words, some of them heated, with the picketers. He returned to his house at the urging of police, but then went outside again and took a swing at Lawson. Although no evidence linked defendants to the arson or to the bomb threat, Dr. Murray felt threatened by and fearful of defendants. Dr. Murray was later convicted of simple assault in the Westfield Municipal Court. *Id.* at 25, 624 *A.*2d 3.

After a final hearing, the Chancery Division entered a permanent injunction in July 1991, prohibiting "defendants and all persons in active concert or participation with them * * * from picketing in any form including parking, parading or demonstrating in any manner, within 300 feet of the Murray residence * * *." The Chancery Division also made other rulings: it dismissed the claim for interference with Dr. Murray's profession; it subsumed the claim for interference with use and enjoyment of property under the tortious invasion of privacy claim; it found Lawson's trespass irrelevant to the picketing; and it characterized plaintiffs' tort claims as invasion of privacy and intentional infliction of emotional distress, but because of the insufficiency of the proofs on those claims did not award money damages for either. *Id.* at 26, 624 *A.*2d 3.

On appeal, defendants claimed that the injunction violates separation-of-powers principles, is an impermissible prior restraint,

violates defendants' free-speech rights, and is unwarranted because of Dr. Murray's "unclean hands" resulting from the assault on Lawson. Plaintiffs did not cross-appeal the Chancery Division's other rulings. *Id.* at 26–27, 624 *A.*2d 3.

The Appellate Division affirmed the 300-foot restriction. First, the court discerned no separation-of-powers problem, reasoning that the trial court has inherent equitable power to enforce a right to residential privacy, even in the absence of a local ordinance. *Id.* at 27–31, 624 *A.*2d 3. Second, the Appellate Division found that the injunction survives a free-speech challenge because it is a reasonable time, place, and manner restriction. *Id.* at 31–36, 624 *A.*2d 3. Finally, the Appellate Division concluded that the trial court had not abused its discretion by failing to apply the "unclean hands" doctrine to deny plaintiffs equitable relief inasmuch as Dr. Murray's conduct had not been so egregious as to preclude such relief altogether. *Id.* at 36–38, 624 *A.*2d 3.

### B. *Boffard v. Barnes*

Again we turn to the Appellate Division's reported decision for the factual recital.

Like Dr. Murray, plaintiff Dr. Daryl Boffard is a New Jersey-licensed obstetrician and gynecologist. 264 *N.J.Super.* at 13, 624 *A.*2d 1. He practices with an Irvington medical group that offers obstetrical and gynecological care, including abortion services. *Id.* at 13–14, 624 *A.*2d 1. Defendants, anti-abortion protestors, had been picketing the Irvington clinic for two years before they picketed the Boffard residence. Dr. Boffard lives in a house in Short Hills with his wife, plaintiff Virginia Boffard, and three young children. The Boffard residence is on a quiet cul-de-sac containing only one other house, and the street is so narrow that only one car at a time may traverse it. Because the Boffards do not have a backyard, their children play in the front yard of the house and on an adjoining lot. *Id.* at 14, 624 *A.*2d 1.

On September 8, 1990, approximately twenty picketers gathered in front of the Boffard residence. The picketers carried placards

saying, among other things, "Dr. Daryl Boffard Kills Babies" and "God Says Thou Shalt Not Kill." Other signs had pictures; one showed a mutilated full-term baby, and another showed bloody fetal parts with the caption "This is an abortion." When Mrs. Boffard approached the demonstrators, they refused to move. One demonstrator said to her, "Your husband is a murderer." Another demonstrator gave a teenage neighbor a bible and told her, "The doctor who lives there is a murderer." *Ibid.*

Defendants characterized their protest as peaceful. They claimed that only Mrs. Boffard had been disruptive and confrontational. In fact, one protestor called the police to report Mrs. Boffard's alleged hostile conduct. Two police officers arrived and instructed the protestors to picket only on the adjoining street. The protest ended after about one hour. *Ibid.*

Plaintiffs filed suit in the Chancery Division seeking to enjoin the picketing. They alleged that defendants, Barnes, Black, Ford, Carlstrom, and fictitiously-named others, had deprived them of the use and enjoyment of their property and that defendants had caused them mental and emotional pain and anguish. Accordingly, on September 14, 1990, the court issued a temporary restraining order, prohibiting defendants from picketing within 200 feet of the Short Hills cul-de-sac, from referring to Dr. Boffard as a "murderer" or a "killer," from depicting fetuses on placards, and from publishing plaintiffs' address. The order also limited to six the number of demonstrators who could protest near plaintiffs' residence. *Id.* at 14–15, 624 *A.*2d 1.

On April 8, 1991, the Chancery Division issued a preliminary injunction against defendants. 248 *N.J.Super.* 501, 591 *A.*2d 699 (1991). Five months thereafter, the Chancery Division made that preliminary injunction permanent. Both the preliminary and the permanent injunction provided:

ORDERED that the defendants and all persons and organizations associated with or acting in concert or combination with them be ENJOINED and RESTRAINED as follows:

1. From gathering, parading, patrolling for the purpose of demonstrating or picketing within the immediate vicinity of plaintiffs' residence * * *.

2. Distributing flyers to plaintiffs' neighbors which contain references to [Dr. Boffard] as being a murderer or killer or his practice as involving murder or killing or which contains any other inflammatory language or which sets forth the plaintiffs' home address.

3. Carrying placards which contain depictions of a fetus * * *.

[264 *N.J.Super.* at 13, 624 *A.*2d 1.]

On February 19, 1991, before the Chancery Division issued its preliminary and permanent injunctions, the Township Committee passed an ordinance, Section 15–1–28, stating: "It is unlawful for any person to engage in picketing before or about the residence or dwelling of any individual in Millburn Township." No party has suggested that the Chancery Division relied on that ordinance in issuing the restrictions, and defendants do not challenge that ordinance in these proceedings.

On April 12, 1993, the same panel of the Appellate Division as upheld the *Murray* injunction upheld paragraph one of the *Boffard* injunction, prohibiting defendants from protesting "within the immediate vicinity" of the Boffard residence. 264 *N.J.Super.* at 16, 624 *A.*2d 1. The Appellate Division reasoned that the paragraph-one restriction is a constitutional time, place, and manner restriction. *Ibid.* The court struck down paragraphs two and three of the injunction, however, finding that those restrictions are impermissibly content based. *Ibid.* On this appeal, therefore, we assess the validity of only the paragraph-one restriction.

## II

Defendants in both cases assert that in the absence of violent conduct or conduct in violation of a statute or an ordinance, the Chancery Division has no inherent authority to impose injunctive restrictions on protected expression. Put differently, defendants argue that the judiciary may not issue an equitable remedy without proof of violence or legal liability. We do not agree.

In *Horizon Health Center v. Felicissimo,* 135 *N.J.* 126, 638 *A.*2d 1260 (1994), decided today, we upheld the authority of the Chancery Division to issue an injunction restricting the expressive

activities of anti-abortion protestors who had demonstrated peacefully outside an abortion and family-planning clinic. The defendants in that case made the same argument that defendants make here, namely, that the Chancery Division could not enjoin their peaceful expression. In *Horizon Health Center* we held that the Chancery Division, a court of equity, does have the authority to restrict peaceful expressive activity to enforce the public policies of accessibility of medical services and maintenance of medical standards, *id.* at 142–147, 638 *A.*2d 1260, protection of private property, *id.* at 147, 638 *A.*2d 1260, and public safety, *id.* at 147, 638 *A.*2d 1260.

Here, the Chancery Division entered the injunction against defendants to enforce a public policy favoring the protection of residential privacy. In Part III, B of this opinion, we conclude that residential privacy represents a sufficient public-policy interest to justify injunctive restrictions and that it implicates a significant government interest. We therefore conclude that the Chancery Division had the power to enjoin the non-violent, non-criminal activity of defendants to protect plaintiffs' residential privacy.

Decisions of other courts upholding injunctive restrictions against peaceful picketers to protect residential privacy support our conclusion. See, *e.g., Dayton Women's Health Center v. Enix,* 68 *Ohio App.*3d 579, 589 *N.E.*2d 121, 127 (affirming permanent injunction against peaceful picketing at residences of abortion-clinic personnel by protestors who had engaged in tortious conduct at clinic itself but not at residences of personnel), *appeal dismissed,* 62 *Ohio St.*3d 1500, 583 *N.E.*2d 971 (1991), *cert. denied sub nom. Sorrell v. Dayton Women's Health Center,* —— *U.S.* ——, 112 *S.Ct.* 3033, 120 *L.Ed.*2d 903 (1992); *Klebanoff v. McMonagle,* 380 *Pa.Super.* 545, 552 *A.*2d 677, 678 (1988) (upholding injunction against peaceful anti-abortion picketers outside residence of physician to protect residential privacy), *appeal denied,* 522 *Pa.* 620, 563 *A.*2d 888 (1989). *But see Valenzuela v. Aquino,* 853 *S.W.*2d 512, 513–14 (Tex.1993) (finding permanent injunction

against selected residential picketing by anti-abortion protestors improper because court had made no determination of legal liability).

Our inquiry does not end with our determination that the Chancery Division had the authority to issue the injunctions, however. For the exercise of the Chancery Division's authority to be valid, the restrictions must balance defendants' free-speech rights and plaintiffs' residential-privacy interests. *See Horizon Health Center, supra,* 135 *N.J.* 138, 638 *A.*2d 1260. The issue is whether the specific restrictions that the Chancery Division imposed are permissible.

### III

In *Horizon Health Center* we held that a Chancery Division injunction prohibiting picketing outside an abortion clinic "regulates expressive activity traditionally protected by the First Amendment." 135 *N.J.* at 138, 638 *A.*2d 1260. Because the injunctions in these cases regulate the same activity—the *Murray* injunction prohibits "picketing in any form," and the *Boffard* injunction prohibits "gathering, parading, patrolling for the purpose of demonstrating or picketing"—they also regulate First Amendment expression and we must analyze them accordingly.

The injunctions here, restricting expressive activity on public streets and sidewalks in residential neighborhoods, regulate expressive activity in a traditional public forum. In *Horizon Health Center,* we observed that public streets and sidewalks are archetypical traditional public forums. *Id.* at 138–139, 638 *A.*2d 1260. Moreover, as the Supreme Court noted in *Frisby v. Schultz,* 487 *U.S.* 474, 480, 108 *S.Ct.* 2495, 2500, 101 *L.Ed.*2d 420, 429 (1988), "a public street does not lose its status as a traditional public forum simply because it runs through a residential neighborhood."

■ Therefore, inasmuch as the injunctions proscribe protected activity in a traditional public forum, we evaluate them under the stringent standards the Supreme Court has outlined for regulating speech in such forums.

"In these quintessential public for[ums], the government may not prohibit all communicative activity. For the State to enforce a content-based exclusion it must show that its regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end. * * *. The State may also enforce regulations of the time, place, and manner of expression which are content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication."

[*Frisby, supra,* 487 *U.S.* at 481, 108 *S.Ct.* at 2500–01, 101 *L.Ed.*2d at 429 (quoting *Perry Educ. Ass'n v. Perry Local Educators' Ass'n,* 460 *U.S.* 37, 45, 103 *S.Ct.* 948, 955, 74 *L.Ed.*2d 794, 804 (1983).]

The threshold inquiry, then, is whether the injunctions against defendants are content neutral.

### A. Content Neutrality

A restriction is content neutral if it can be justified without reference to the content of the regulated speech. *Horizon Health Ctr., supra,* 135 *N.J.* at 140, 638 *A.*2d 1260. If a restriction is imposed because of a disagreement with the message the regulated speech conveys, however, it is impermissibly content-based. *Ibid.* at 140, 638 *A.*2d 1260.

We conclude that the injunctions against defendants are content neutral. They do not reflect a disagreement with defendants' respective messages, and we can justify them without reference to the content of defendants' speech. The final injunctions in both cases do not refer in any way to the content of defendants' speech but merely forbid them from picketing within a certain distance of plaintiffs' residences. The Chancery Division in each case imposed the restrictions not because the court disagreed with defendants' viewpoint but to insure that defendants' communication of that viewpoint does not impermissibly interfere with plaintiffs' residential privacy. In imposing the injunctions, the Chancery Division focused not on the effect of defendants' message on plaintiffs but on defendants' sheer physical presence outside of plaintiffs' homes.

We reject defendants' argument that the injunctions are content based merely because they restrain the expressive activities only of anti-abortion picketers. As we noted in *Horizon Health Center,*

"Merely because an injunction restricts only a specified group does not make that injunction content based. Courts always tailor injunctive relief to address the specific facts presented to them." 135 *N.J.* at 143, 638 *A.*2d 1260. Only these defendants interfered with plaintiffs' residential privacy. Accordingly, the Chancery Division restrained only the activities of only these defendants.

Defendants also argue that a Chancery Division judge has unbridled discretion in determining whether to issue injunctive relief. Therefore, the argument goes, any injunctive relief a judge issues is content based because that judge may impermissibly consider content in deciding whether to grant relief. To support their argument, defendants cite *Forsyth County, Georgia v. Nationalist Movement,* —— *U.S.* ——, ——, 112 *S.Ct.* 2395, 2403–04, 120 *L.Ed.*2d 101, 109–10 (1992) (holding ordinance placing unfettered discretion with county administrator to assess security needs for parade permit fees to be content based). So strained is that analogy, however, that we dwell on the point only long enough to reject it out of hand. The differences between a county administrator's discretion and the discretion imposed in a judicial officer, whose flexibility in the exercise thereof is constrained by well-recognized principles of law, are too obvious to warrant citation of authority.

Finally, the decisions of other courts analyzing similar injunctions against anti-abortion protestors outside doctors' residences support our conclusion that the injunctions are content neutral. See, *e.g., Kaplan v. Prolife Action League,* 111 *N.C.App.* 1, 431 *S.E.*2d 828, 843 (1993) (finding restriction prohibiting picketing within zone near plaintiff's residence content neutral because it "makes no mention of abortion or any other substantive issue. It does not flatly ban picketing * * * nor does it prohibit anti-abortion picketing while permitting residential picketing having other aims. * * *. [T]he trial court [focused not] on the effect * * * of defendants' message * * *, but rather on defendants' physical presence * * *") (citations omitted), *review denied,* 335 *N.C.* 175, 436 *S.E.*2d 379 (1993), *petition for cert. filed,* No. 93–

1159 (Jan. 18, 1994); see also *Dayton Women's Health Center, supra*, 68 *Ohio App.*3d 579, 589 *N.E.*2d at 127 (finding order prohibiting picketing only in front of certain residences to be content neutral because "[i]t does not prohibit residential anti-abortion picketing while permitting residential picketing having other aims"); *Klebanoff, supra*, 552 *A.*2d at 678–79 (finding injunction prohibiting picketing in front of doctor's house to be content neutral because it does not "refer[ ] to the content or subject matter of the protest. The injunction contains no invitation to subjective or discriminatory enforcement.").

Having determined that the Chancery Division imposed content-neutral restrictions, we turn now to the question whether those restrictions are narrowly tailored to serve significant government interests and whether they leave open ample alternative channels of communication for defendants. *See Frisby, supra*, 487 *U.S.* at 481, 108 *S.Ct.* at 2500–01, 101 *L.Ed.*2d at 429.

### B. *Significant Government Interests*

■ Plaintiffs assert that they are entitled to residential privacy, that defendants' picketing interfered with that privacy, and that the State has a significant interest in protecting their privacy. We agree with plaintiffs and hold that a common-law public policy in favor of protection of residential privacy exists and that that policy implicates a significant government interest justifying the imposition of injunctive restrictions. We therefore need not, and do not, rely on a constitutionally-based residential-privacy right stemming from either the New Jersey or the federal constitution to justify the imposition of restrictions.

Courts look to a variety of sources, including judicial decisions, to find public policy. *Pierce v. Ortho Pharmaceutical Corp.*, 84 *N.J.* 58, 72, 417 *A.*2d 505 (1980) (stating "The sources of public policy include legislation; administrative rules, regulations or decisions; and judicial decisions"). The decisions of this Court support a conclusion that New Jersey has a public policy in favor of protecting the residential privacy of its citizens.

For example, we have upheld the authority of a municipality to use its zoning power "to secure and maintain 'the blessings of quiet seclusion' and to make available to its inhabitants the refreshment of repose and the tranquility of solitude." *Berger v. State*, 71 *N.J.* 206, 223, 364 *A.*2d 993 (1976) (quoting *Village of Belle Terre v. Boraas*, 416 *U.S.* 1, 9, 94 *S.Ct.* 1536, 1541, 39 *L.Ed.*2d 797, 804 (1974)); *see State v. Baker*, 81 *N.J.* 99, 106, 405 *A.*2d 368 (1979) (same). Moreover, this Court has recognized that the State has an interest in protecting its citizens "against a sense of unease and dangers reasonably to be apprehended on account of strangers filtering through the community." *Borough of Collingswood v. Ringgold*, 66 *N.J.* 350, 357, 331 *A.*2d 262 (1975), *appeal dismissed*, 426 *U.S.* 901, 96 *S.Ct.* 2220, 48 *L.Ed.*2d 826 (1976). Finally, we have noted that even when an intrusion on residential privacy takes the form of constitutionally-protected expression, "the right of the [State] to protect its homeowners against * * * untoward invasions of privacy * * * deserves some weight." *Id.*, 66 *N.J.* at 369, 331 *A.*2d 262. We find in the cited authorities a public policy favoring the protection of residential privacy. We are convinced as well that enforcement of that policy constitutes a significant government interest.

The United States Supreme Court decision in *Frisby, supra,* supports our conclusion that protection of residential privacy represents a significant government interest. In that case, the Supreme Court upheld against a First Amendment challenge an ordinance forbidding " 'picketing before or about the residence or dwelling of any individual * * *.' " 487 *U.S.* at 477, 108 *S.Ct.* at 2498, 101 *L.Ed.*2d at 426–27 (quoting municipal ordinance). The ordinance itself contained the following statement of purpose: " 'the protection and preservation of the home' through assurance 'that members of the community enjoy in their homes and dwellings a feeling of well-being, tranquility, and privacy.' " *Id.* at 477, 108 *S.Ct.* at 2498, 101 *L.Ed.*2d at 427 (quoting municipal ordinance).

The Supreme Court found that the protection of residential privacy is a significant government interest. *Id.* at 484, 108 *S.Ct.* at 2502, 101 *L.Ed.*2d at 431. Although failing to identify the source of the State's interest, the Court reasoned that " '[t]he State's interest in protecting the well-being, tranquility, and privacy of the home is certainly of the highest order.' " *Ibid.* (quoting *Carey v. Brown,* 447 *U.S.* 455, 471, 100 *S.Ct.* 2286, 2296, 65 *L.Ed.*2d 263, 276 (1980)). The Court described the home as " 'the last citadel of the tired, the weary, and the sick,' " *ibid.* (quoting *Gregory v. Chicago,* 394 *U.S.* 111, 125, 89 *S.Ct.* 946, 953, 22 *L.Ed.*2d 134, 144 (1969) (Black, J., concurring)), concluding that " 'preserving the sanctity of the home * * * is surely an important value.' " *Ibid.* (quoting *Carey, supra,* 447 *U.S.* at 471, 100 *S.Ct.* at 2295, 65 *L.Ed.*2d at 276)).

The Supreme Court also pointed out that "protection of the unwilling listener" is an important component of residential privacy because citizens can become captive listeners in their own homes. *Id.,* 487 *U.S.* at 484, 108 *S.Ct.* at 2502, 101 *L.Ed.*2d at 431; *see also* Hazel A. Landwehr, Note, *Unfriendly Persuasion: Enjoining Residential Picketing,* 43 *Duke L.J.* 148, 158 (1993) (noting that State's "ability to control the flow of ideas into the home is based not only on a concern for preserving the sanctity of the home but also on a recognition that homeowners present a captive audience for speakers"). The Supreme Court concluded that "a special benefit of the privacy all citizens enjoy within their own walls, which the State may legislate to protect, is an ability to avoid intrusions." *Id.* at 484, 108 *S.Ct.* at 2502, 101 *L.Ed.*2d at 432.

In sum, we conclude that New Jersey has a common-law public policy in favor of protecting residential privacy and that enforcement of that policy constitutes a significant government interest. We therefore accept the reasoning of the Appellate Division to the extent that it based its justification of the restrictions against defendants on common-law notions.

Because common-law public policy alone suffices to justify imposing restrictions on defendants, we decline to decide whether article 1, paragraph 1 of the New Jersey Constitution provides a basis for injunctive relief. *See O'Keefe v. Passaic Valley Water Comm'n*, 132 *N.J.* 234, 240–41, 624 *A.*2d 578 (1993) (noting that courts should not decide constitutional questions unless necessary to dispose of litigation). Thus, to the extent the Appellate Division may have relied on the New Jersey Constitution to impose restrictions on defendants, *see Murray, supra*, 264 *N.J.Super.* at 30–31, 624 *A.*2d 3, we do not adopt that court's reasoning.

Similarly, we do not base our decision in respect of the injunctions on a federal constitutional right to residential privacy. First, we need not reach that constitutional issue inasmuch as we can decide the cases before us on common-law principles. *See O'Keefe, supra*, 132 *N.J.* at 240–41, 624 *A.*2d 578. Second, in upholding the injunctions, the Appellate Division did not appear to rely on any federal constitutional right to residential privacy. Third, no such federal right to residential privacy appears to exist: although the Supreme Court justified an ordinance against selected residential picketing on the protection of residential privacy, *Frisby, supra*, 487 *U.S.* at 484–85, 108 *S.Ct.* at 2502–03, 101 *L.Ed.*2d at 431–32, the Court did not establish explicitly a federal constitutional right to residential privacy. Moreover, even if the Supreme Court had established such a right, the State could not protect that right against private interference. *See Bray v. Alexandria Women's Health Clinic*, —— *U.S.* ——, ——, 113 *S.Ct.* 753, 771, 122 *L.Ed.*2d 34, 52 (1993) (noting that general federal constitutional right of privacy is not protected against private interference).

We therefore come to the question whether the specific restrictions imposed are narrowly tailored to serve the significant government interest in protection of residential privacy. That inquiry requires us to balance defendants' constitutional right of free expression against plaintiffs' common-law interest in residential privacy. *See Crowe v. De Gioia*, 90 *N.J.* 126, 134, 447 *A.*2d 173

(1982) (outlining requirements to issue injunctive relief); *cf. In re Farber,* 78 *N.J.* 259, 268, 394 *A.*2d 330 (noting balance between non-constitutional interest of press in protecting confidentiality of sources and criminal defendant's constitutional right to fair trial), *cert. denied,* 439 *U.S.* 997, 99 *S.Ct.* 598, 58 *L.Ed.*2d 670 (1978).

### C. *Narrow Tailoring*

■ A regulation is narrowly tailored if it promotes a significant government interest that the government could not achieve as effectively without the regulation. *Horizon Health Ctr., supra,* 135 *N.J.* at 146, 638 *A.*2d 1260. "Yet, a regulation may not 'burden substantially more speech than is necessary to further government's legitimate interests.' " *Id.* at 148, 638 *A.*2d 1260 (quoting *Ward v. Rock Against Racism,* 491 *U.S.* 781, 799, 109 *S.Ct.* 2746, 2758, 105 *L.Ed.*2d 661, 680 (1989)).

#### 1. *Murray v. Lawson*

■ The *Murray* injunction is a "place" injunction that prohibits defendants "from picketing in any form including parking; parading or demonstrating in any manner, within 300 feet of the Murray residence * * *." 264 *N.J.Super.* at 26, 624 *A.*2d 3. We conclude that that restriction meets the requirements for narrow tailoring of a "place" restriction.

In *Frisby, supra,* the Supreme Court found narrowly tailored a municipal ordinance prohibiting " 'picketing before or about the residence or dwelling of any individual * * *.' " 487 *U.S.* at 477, 108 *S.Ct.* at 2498, 101 *L.Ed.*2d at 426–27 (quoting the ordinance). The Supreme Court reasoned that

> the picketing [prohibited by the ordinance] is narrowly directed at the household, not at the public. The type of picketers banned * * * do not seek to disseminate a message to the general public, but to intrude upon the targeted resident * * *. Moreover, even if some such picketers have a broader communicative purpose, their activity nonetheless inherently and offensively intrudes on residential privacy.
>
> [*Id.* at 486, 108 *S.Ct.* at 2503, 101 *L.Ed.*2d at 433.]

The Court noted further that the First Amendment permits restrictions to protect the captive listener and that the target of

focused residential picketing is indeed "captive" because "[t]he resident is figuratively, and perhaps literally, trapped within the home, and because * * * [the resident] is left with no ready means of avoiding the unwanted speech." *Id.* at 487, 108 *S.Ct.* at 2504, 101 *L.Ed.*2d at 433. Accordingly, the Court concluded that a complete ban of focused residential picketing is narrowly drawn to serve the interest of protection of residential privacy. *Id.* at 487–88, 108 *S.Ct.* at 2504, 101 *L.Ed.*2d at 434.

Moreover, the decisions of other courts, upholding total bans on focused picketing within a certain distance of a target's residence, support a conclusion that a 300–foot ban restriction on picketing is permissible. See, *e.g., Northeast Women's Center v. McMonagle,* 939 *F.*2d 57, 67 (3d Cir.1991) (imposing 500–foot restriction on anti-abortion picketers outside residences of clinic staff and remanding to determine if circumstances require even greater restriction); *State v. Castellano,* 506 *N.W.*2d 641, 647 (Minn.Ct.App. 1993) (finding ordinance prohibiting picketing "focused on or taking place in front of a particular single residential dwelling" to be narrowly tailored); *Kaplan, supra,* 431 *S.E.*2d at 844–47 (finding 300–foot restriction against residential anti-abortion protestors to be narrowly drawn); *Dayton Women's Health Center, supra,* 589 *N.E.*2d at 127 (upholding ban on picketing "within viewing distance" of residences of abortion-clinic patients and staff); *Klebanoff, supra,* 552 *A.*2d at 680–81 (finding permanent injunction prohibiting anti-abortion protestors from picketing directly in front of doctor's house to be narrowly tailored). *But see Ramsey v. Edgepark, Inc.,* 66 *Ohio App.*3d 99, 583 *N.E.*2d 443, 452 (reversing 200–yard zone of protection, finding that picketers "have a right to picket in the neighborhood, block or street where [targets of picket] live"), *appeal dismissed,* 53 *Ohio St.*3d 712, 560 *N.E.*2d 780 (1990).

We are satisfied that the 300–foot restriction against defendants is narrowly tailored to protect plaintiffs' residential privacy. Defendants directed their picketing activity toward plaintiffs and not toward the public. Defendants' demonstration spanned a length

of approximately ten houses, but plaintiffs' house was never free from picketers during the protest. Even if some defendants did have a broader communicative purpose, their activity inherently and offensively intruded on plaintiffs' residential privacy. Of particular concern to the Chancery Division was the effect of the picketing on plaintiffs' three children: the trial court determined that plaintiffs had become captive listeners within their own home, a circumstance that required a total ban on picketing. We agree.

Nor will we disturb the Chancery Division's finding that the spatial scope of the total ban should be 300 feet. The record discloses that one of the demonstrators trespassed on a neighbor's lawn, that other children live in the neighborhood, and that a demonstrator warned a young neighborhood boy that a killer lived in the neighborhood. The Chancery Division made specific findings, from which it concluded that a 300–foot restriction was appropriate. "While the court could possibly achieve its goal with a narrower [speech-]free zone, we decline to entertain quibbling over a few feet." *Portland Feminist Women's Health Ctr. v. Advocates for Life, Inc.*, 859 *F*.2d 681, 686 (9th Cir.1988). We likewise will not disturb the Chancery Division's imposition of a 300–foot zone.

### 2. *Boffard v. Barnes*

The *Boffard* injunction prohibits defendants "[f]rom gathering, parading, patrolling for the purpose of demonstrating or picketing *within the immediate vicinity of* plaintiffs' residence * * *." 264 *N.J.Super.* at 13, 624 *A*.2d 1 (emphasis added). For the same reasons that we find a complete ban on focused residential picketing permissible in *Murray*, we find that a complete ban on picketing outside the Boffard residence is permissible as well. However, because we conclude that the Chancery Division could have more precisely defined the spatial scope of its ban, we remand to that court.

Injunctions are supposed to "be specific in terms; [and] describe in reasonable detail * * * the act or acts sought to be restrained * * *." *R.* 4:52–4. The description "within the imme-

diate vicinity of" contained in the *Boffard* injunction is neither specific nor reasonably detailed. Although defendants do not argue that the restriction is unconstitutionally vague, we are sure that neither the parties nor the police can determine with any certainty how close to plaintiffs' residence "within the immediate vicinity of" can legitimately take one. We could limit that language to preclude picketing "before or about the residence or dwelling of" plaintiffs—a restriction that the Supreme Court upheld in *Frisby, supra*, 487 *U.S.* at 482, 108 *S.Ct.* at 2501, 101 *L.Ed.*2d at 430, by interpreting it to "prohibit only picketing focused on, and taking place in front of, a particular residence." But "within the immediate vicinity of" seems to prohibit more than picketing only "in front of" plaintiffs' residence. "Vicinity" means "a surrounding area or district: locality, neighborhood," *Webster's Third New International Dictionary*, 2550 (1971), and "immediate" means "characterized by contiguity: existing without intervening space or substance: being near or at hand: not far apart or distant." *Id.* at 1129.

Thus, because "within the immediate vicinity of" does not describe sufficiently the area in which the injunction's prohibition applies, we remand to the Chancery Division to set forth more precisely the scope of the ban. When imposing the "within the immediate vicinity of" restriction, the Chancery Division may have had a particular area in mind. If so, the court could easily clarify that restriction. We recognize, however, that if it is to impose a more specific restriction, the Chancery Division may have to make additional findings. We are mindful as well that the Chancery Division has great flexibility in defining the scope of the ban; the court could, for example, preclude picketing on plaintiffs' street, or could prohibit that activity within a specific number of feet from, within sight distance of, or in front of plaintiffs's residence. We leave that determination to the Chancery Division.

### D. *Alternative Channels of Communication*

■ We are convinced that the *Murray* injunction and the *Boffard* injunction, which, on modification, will prohibit picketing

within a certain distance from plaintiffs' residence, leave open ample alternative channels of communication for these defendants. Defendants may communicate their message to the physicians, to the physicians' families, and to the physicians' neighbors on any residential street beyond the zone the injunctions establish. They may also picket and protest outside the physicians' offices and outside the clinics and hospitals where the physicians perform medical procedures. Although defendants may not picket within the zones the injunctions establish, they have ample other opportunities to express their message to their target audience.

## IV

Defendants in *Boffard* claim that the permanent injunction against them also violates their right of free expression under article I, paragraph 6 of the New Jersey Constitution. That provision provides in pertinent part: "Every person may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that right." For the same reasons that we decided not to analyze *Horizon Health Center, supra,* under the New Jersey Constitution, we similarly decline to analyze *Boffard* under our State Constitution. See 135 *N.J.* at 154, 638 *A.*2d 1260. Thus, we confine our discussion to those First Amendment principles we have outlined already.

## V

In *Murray v. Lawson* we affirm the judgment of the Appellate Division.

In *Boffard v. Barnes* we modify the judgment of the Appellate Division. The cause is remanded to the Chancery Division for further proceedings consistent with this opinion. As so modified the judgment is affirmed.

*For affirmance in Murray v. Lawson*—Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—7.

*Opposed*—None.

*For Modification and affirmance in Boffard v. Barnes*—Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—7.

*Opposed*—None.