**CONNECTICUT GENERAL LIFE INSURANCE COMPANY, Plaintiff,**

v.

**Herbert PUNIA, Leonard Punia and Bernard Weissman, Defendants.**

Civ. No. 93–593 (WHW).

United States District Court, D. New Jersey.

April 25, 1995.

Amended Opinion April 27, 1995.

Salvatore T. Alfano, Barry & McMoran, P.C., Newark, NJ, for Conn. Gen. Life Ins. Co.

Dennis M. Reznick, Budd, Larner, Gross, Rosenbaum, Greenberg & Sade, Short Hills, NJ, for Herbert Punia, Leonard Punia and Bernard Weissman.

## OPINION

WALLS, District Judge.

The defendants, Herbert Punia, Leonard Punia and Bernard Weissman (collectively, "the guarantors") move for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. Argument was heard on April 10, 1995. For reasons stated below, the motion is granted, dismissing plaintiff Connecticut General Life Insurance Company's ("CGLIC") complaint.

### Background

The plaintiff, Connecticut General Life Insurance Company, brought this lawsuit to enforce the terms of a $3 million personal guaranty given by the guarantors to secure an $11 million loan given to the guarantors' partnership, Suburban Mall IV Associates ("SMA") by CGLIC.

This dispute arose during the prosperous 1980's, when CGLIC provided financing for the guarantors' numerous real estate investments. The guarantors' borrowed significant sums from CGLIC-owing at least $100 million by 1990. In 1985, SMA obtained an $11 million loan from CGLIC, evidenced by a promissory note dated June 27, 1985 with a maturity date of July 1, 1990. The note was secured by a first mortgage on real property in Florham Park, NJ, ("the Property") which was improved by an office building, in which Blue Cross/Blue Shield of New Jersey was the principal tenant. Only the property secured the loan; CGLIC had no recourse against SMA nor any personal guarantees from the defendants.

In early 1990, Blue Cross/Blue Shield indicated that when its lease expired it would buck the trend established by other companies which had been abandoning urban areas for suburban environs, and leave SMA's Property to become a tenant in a newly-

constructed building in Newark. Without its major source of income, SMA faced the prospect of defaulting on its obligation to CGLIC and CGLIC feared that its loan was undersecured. Out of this mutual need, SMA and CGLIC began negotiating to refinance the $11 million loan. Negotiations began in March, 1990 and terms of the refinancing were finally determined in September, 1990. Over those seven months, the parties negotiated the issue of whether Herbert Punia, Leonard Punia and Bernard Weissman, the individuals comprising the SMA partnership, would personally guaranty the debt. CGLIC's initial position was that in recognition of the Property's uncertain financial success, it would require additional security from SMA in the form of the unconditional personal guaranties of payment by the two Mr. Punia's and Mr. Weissman. Those individuals opposed giving such unconditional guarantees. Eventually, the refinancing agreement provided that SMA's partners would personally guaranty the loan, but only to the limited extent of the "top $3 million" of the $11 million debt. The written guaranty agreement recites that,

> The term "Guaranteed Portion of the Debt" shall mean in the aggregate, the "top" $3 million of the Debt. Accordingly, for each and every dollar applied from whatever source toward the repayment of principal of the Debt, the Guaranteed Portion of the Debt shall automatically and correspondingly decrease by like amount.

In addition to the guaranty, the refinancing agreement also contained an escrow provision, which obligated SMA to escrow all of the net operating income from the Property with CGLIC's New Jersey agent. SMA was entitled to use some of the escrowed funds to maintain the Property. In the event of default, the escrowed funds were to be turned over to CGLIC, which was required to reduce the guarantors' liability, dollar for dollar, against all funds received out of the escrow account.

As feared, Blue Cross/Blue Shield moved out of the Property in 1992. Despite the refinancing, SMA was unable to continue payments on the restructured note and defaulted. In August, 1992, CGLIC began a foreclosure action. On December 24, 1992, SMA filed for Chapter 11 Bankruptcy relief. In February, 1993, CGLIC brought the present suit against the guarantors to enforce the terms of their personal guarantees. In November, 1993, after obtaining relief from the automatic bankruptcy stay, CGLIC obtained summary judgment on its foreclosure proceeding against SMA. In March, 1994, final judgment in the foreclosure action was entered in the amount of $12,007,558.00, comprised of $9,872,314.00 (which equaled the original $11 million debt less $1,127,686.00 that CGLIC had received from the escrow account pursuant to the escrow agreement) and interest at 12.78% from November 16, 1993.

At a foreclosure sale on June 20, 1994 CGLIC successfully bid in the Property for $100.00. The fair market value of the Property, according to SMA's appraiser was $5,225,000.00, and to CGLIC's appraiser $4,835,000.00.

The guarantors have brought the present motion for summary judgment. Their position, simply stated, is that once CGLIC chose to foreclose and purchase the Property at auction, they, as limited guarantors, became entitled, under New Jersey law and the clear language of the guaranty, to have the fair market value of the Property credited against their obligation under the guaranty. Because their guaranty was only of $3 million, guaranteeing the "layer" of the debt between $11 million and $8 million, and because the underlying debt has been reduced to an amount below that "layer," the guarantors seek summary judgment dismissing CGLIC's complaint.

### Standard for Summary Judgment

Summary judgment is appropriate where the moving party establishes that "there is no genuine issue of material fact and that [it] is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party must show that if the evidentiary material of record were reduced to admissible evidence in court, it would be insufficient to permit the non-moving party to carry its burden of proof. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Once the moving party has carried its burden under Rule 56, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts in question. *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), *rev'g*, 723 F.2d 238 (3d Cir.1983). The opposing party must set forth specific facts showing a genuine issue for trial and may not rest upon the mere allegations or denials of its pleadings. *Sound Ship Building Co. v. Bethlehem Steel Co.*, 533 F.2d 96, 99 (3d Cir.1976), *cert. denied*, 429 U.S. 860, 97 S.Ct. 161, 50 L.Ed.2d 137 (1976).

The defendants, sued in their status as guarantors, are entitled to summary judgment if the court determines as a matter of law, based upon undisputed facts, that the conditions underlying their guaranty have been discharged.

### Discussion/Analysis

█ The base of defendants' argument must be examined. Does New Jersey law provide that a guarantor of a commercial loan is entitled to have its debt reduced by the fair market value of the collateral that has been foreclosed by the lender?

By statute, certain obligors whose properties are lost through foreclosure have a right to a fair market credit in deficiency actions that are later brought upon the debt. N.J.S.A. 2A:50–3. The purpose behind this law is to prevent a foreclosing lender from gaining a windfall by double recovery, once by taking possession of the collateral, and then by suing the defaulting borrower for money damages in an action on the underlying debt. The "fair market credit" rule requires that the underlying debt be reduced by the fair market value of the foreclosed collateral. Although the statute provides that the fair market value credit rule is not applicable to debts secured for commercial or business purposes, case law has extended the statutory rule to primary obligors in commercial transactions, for equitable reasons. *Citibank, N.A. v. Errico*, 251 N.J.Super. 236, 247, 597 A.2d 1091 (App.Div.1991). Moreover, recent New Jersey decisional law has established that the fair market credit principle extends to a guarantor's obligation in an action brought to enforce the guaranty of a commercial loan. *RTC v. Berman Industries*, 271 N.J.Super. 56, 62, 637 A.2d 1297 (Law Div.1993).

█ The nature of equity, according to Aristotle, is the "correction of the law where, by reason of its universality, it is deficient." 27 Am.Jur.2d *Equity* § 2 at 518. It has been stated that "equity recognizes no rule as binding which will constrain it to do injustice." *Suburban Golf Club v. State Highway Commissioner*, 92 N.J.Super. 125, 142 (App. Div.1966). Generally "equity follows the law" and ordinarily equity will not divest legal rights. *Dunkin' Donuts of America, Inc. v. Middletown Donut Corp.*, 100 N.J. 166, 183, 495 A.2d 66 (1985). However, at times equity is obliged to acknowledge rights not heretofore recognized at law and "equity will never suffer a wrong without a remedy." *See, Murray v. Lawson*, 264 N.J.Super. 17, 28, 624 A.2d 3 (App.Div.1993), *aff'd*, 136 N.J. 32, 642 A.2d 338 (quoting *Orland Properties, Inc. v. Broderick*, 94 N.J.Super. 307, 313–14, 228 A.2d 95 (Ch.Div.1967)).

The Court finds equitable reasons to apply the fair market credit rule here. CGLIC's foreclosure resulted in a substantial recovery to it because the value of the Property, either $4,835,000.00 or $5,225,000.00, was not insignificant. CGLIC exercised its option to foreclose the Property independently, without the insistence of urging or provocation by the guarantors. The fair market credit rule applies based upon the equity of these circumstances: (i) the guaranty agreement states that the amount of the guaranty shall be reduced dollar for dollar for a reduction in the principal debt from whatever source; (ii) CGLIC exercised its option to foreclose the Property upon SMA's default; and (iii) CGLIC bid in the property for $100.00 and in return got the Property valued at between $4,825,000.00 and $5,225,000.00. CGLIC has obtained a substantial recovery. The guarantors are entitled to a corresponding reduction in the principal debt.

█ Next, do the terms of the guaranty mandate summary judgment for the defendants? Determining the answer to the question posed requires a legal determination.

*Nevets, C.M., Inc. v. Nissho Iwai American Corp.*, 726 F.Supp. 525 (D.N.J.1989), *aff'd*, 899 F.2d 1218 (3d Cir.1990).

The written guaranty provides that,

The term "debt" as used in this guaranty shall mean the principal sum evidenced by the Note and secured by the Mortgage, or so much thereof as may be outstanding from time to time together with interest thereon at the rate of interest specified in the Note and all other sums other than principal or interest which may or shall become due and payable pursuant to the provisions of the Note, the Mortgage or other Security Documents.

The term "Guaranteed Portion of the Debt" shall mean in the aggregate, the "top" $3 million of the Debt. Accordingly, for each and every dollar applied *from whatever source* toward the repayment of principal of the Debt, the Guaranteed Portion of the Debt shall automatically and correspondingly decrease by like amount. (emphasis added).

The underlying debt was $12,007,558.00. The fair market value of the Property either is $5,225,000.00—according to the guarantors' appraiser, John O. Lasser, or $4,835,000.00—according to CGLIC's appraiser, L.W. Ellwood & Company. Application of the fair market credit rule leads to the reduction of the debt to $6,782,558.00 or $7,172,558. The guarantors were personally liable for the "top" $3 million of the underlying debt; the amount of the guaranteed debt was to be reduced dollar for dollar whenever repayment of the principal was received from *whatever source*. The guarantors argue that reducing the debt by virtue of the fair market credit rule is tantamount to repayment of the principal because CGLIC's foreclosure on the property reduced the debt by the fair market value of the Property. They argue that this repayment, albeit one arising by operation of law, came from "whatever source."

■■■■ The Court finds that the guarantors' construction of the guaranty agreement is the only reasonable understanding that those words can be given. It is well-settled in New Jersey law that,

Where the terms of a contract are clear and unambiguous, there is no room for interpretation or construction and the courts must enforce those terms as written. The court has no right to rewrite the contract merely because one might conclude that it might well have been functionally desirable to draft it differently. Nor may the courts remake a better contract for the parties than they themselves have seen fit to enter into, or to alter it for the benefit of one party and to the detriment of another.

*Karl's Sales & Service, Inc. v. Gimbel Brothers, Inc.*, 249 N.J.Super. 487, 592 A.2d 647 (App.Div.1991) (citations omitted).

Notwithstanding the terms of the agreement, CGLIC vigorously contends that the defendants' guaranty should not be construed as written. CGLIC's attack is guided by its contention that it never intended the guaranty to be construed in essence, to guarantee only that the Property be worth at least $3 million.

CGLIC contends that construing the terms of the guaranty as the guarantors urge would violate no less than six (albeit overlapping) canons of contract construction: (1) the polestar of construction of a contract is discovering the parties' intent; (2) the constant object of construction is to attain the parties' intent; (3) a contract must be interpreted in the light of the parties' relations; (4) the contract should not be interpreted through an isolated phrase, but rather by reading the contract as a whole and considering the surrounding circumstances; (5) a subsidiary provision should not be interpreted to conflict with the dominant purpose of the contract; and (6) a contract should not be construed so as to render it meaningless. Summarized, the main thrust of CGLIC's argument is that it intended the guaranty to provide additional security to an undercollateralized loan, and that adopting the guarantors' position would undermine that intent.

First, CGLIC claims that "the obvious purpose of the Guaranty was to provide additional security to CGLIC," and adopting the guarantors' position would frustrate the parties' intent. CGLIC seizes upon defendant Herbert Punia's deposition testimony that he

considered the guaranty to be mere "window dressing" that could not be resorted to unless the value of the Property dropped below $3 million, an event akin to "the end of the world." CGLIC argues that it considered the guaranty to be an important component of the refinancing because it provided more security for a loan resting on trembling foundations.

Notwithstanding Mr. Punia's "window dressing" comment, the guarantors do not contend that the guaranty lacks legal force and effect. Rather, they argue that the condition set forth in the guaranty to release their responsibility, that is, the reduction of the principal amount of SMA's loan below $8 million, has been met.

While it may have been CGLIC's initial intent that the guaranty provide more security, what it finally chose and reduced to the writing of the final agreement was that the guaranty be limited to the "top" $3 million. The clear meaning of this is that debt between the $11 million and $8 million layer. Therefore, once the principal debt is reduced below the guaranteed layer, the guarantors' obligations are dissolved.

■■■ CGLIC also argues that the term "guaranty," in one section of the agreement, is called a "guaranty of payment" instead of a "guaranty of collection." Generally, a guaranty of collection requires that the party guaranteed must first proceed against the principal debtor before enforcing the guaranty, whereas in a guaranty of payment, the guaranty is absolute, not contingent upon first resort to another source. CGLIC asserts it was not its intent to accept a guaranty of a limited nature. Indeed, the written words of the contract are in agreement:

> This is a *guaranty of payment* and *not* of collection and the undersigned waives any right to require that any action be brought against the Borrower or any other person or party or to require that resort be had to any security or to any balance of any deposit account or credit on the books of the Lender in favor of the Borrower or any other person or party. The answer to this contention is found in the written words of the agreement. (emphasis added).

CGLIC argues that "this language of absolute and unconditional guaranty is flatly contrary to the guarantors' position that, as a condition to recovery, the Lender must reduce the guaranty by the foreclosure proceeds or a fair market credit." But this misstates (or misses) the guarantors' point. The defendant-guarantors have not argued that CGLIC was obligated to reduce SMA's debt by the Property's fair market value before proceeding to enforce the guaranty. Rather, the defendants' argument is that once CGLIC actually did foreclose, the terms of the guaranty require an application of the fair market credit rule to reduce SMA's underlying debt, whether the guaranty was one of payment or collection. SMA's debt was reduced, not by the scant $100.00 which CGLIC bid on the Property, but instead by the Property's approximate value of $5 million. The guaranty provides that the guarantors' obligation be reduced by that amount because its value reduces the principal debt.

The Court holds that the guaranty agreement should be construed exactly as it is written. That is, the guarantors' agreed personally to guaranty the "top" $3 million of an $11 million debt, and that the amount of the debt guaranteed is reduced by the amount that the principal is reduced from "whatever source." A reduction in the principal by operation of the Court's application of New Jersey's fair market credit rule is well within the definition of "whatever source."

Moreover, there are no facts in dispute regarding the correct interpretation of the guaranty's language that would materially impact the determination of whether the guarantors' obligation under the guaranty is discharged. Specifically, there is no dispute over the correct interpretation of the guaranty's "top" $3 million mechanism.

Under the plain reading of this provision, the defendants' guaranty is limited to the "top" $3 million of the total $11 million debt. Affirmation is found in the following excerpts from deposition testimony. CGLIC's own attorney, Richard Milder, Esq., who prepared the guaranty document stated the following:

> Question: Let me give you an example. Does the language in the guaranty as to

the top $3 million of the loan refer to the first $3 million paid down on the loan, i.e. from $11 million to $8 million?

Answer: Yes.

Brett Meck, who supervised the CGLIC unit responsible for refinancing the SMA loan, testified that the "top" $3 million language,

> means that the first 3 million dollars at risk in our loan are really guaranteed by the borrower.... It's my understanding the 3 million, the top 3 million-dollar guaranty would be paid down as to the loan principal, reduced from 11 million down to 8 million dollars.

A CGLIC work-out officer, John Shaw, similarly interpreted the mechanics of the guaranty,

> "To me that means that as the top portion of the loan, the 3 million dollars between 8 and 11 million dollars of the principal balance is paid down, the guaranty gets reduced by the same amount."

Finally, CGLIC's counsel, in a last-minute "sur-reply" submitted in opposition to this motion, states that "the defendants guaranteed repayment of the top $3 million of the loan, i.e., the amount of the loan between $8 million and $11 million."

Interpreting this provision of the guaranty in concert with the fair market credit rule leads to the conclusion that the defendants' guaranty was released when the principal on SMA's debt was reduced under $8 million, which occurred when CGLIC foreclosed on the Property.

This position finds support in a recent decision from a sister state. In *BankEast v. Michalenoick*, 138 N.H. 367, 639 A.2d 272 (1994), the Supreme Court of New Hampshire reviewed an extremely similar scenario. A note payee brought an action against a guarantor. The loan was for $800,000.00. According to the agreement, the guarantor guaranteed up to $100,000.00 of the borrower's indebtedness. The agreement provided that the guaranty would be reduced to the extent of any principal paydown on the underlying debt. The agreement also provided that the guaranty was absolute, unconditional, and in no way conditioned upon any re-

quirement that the lender first resort to the security to satisfy the debt. The parties agreed that the guaranty applied to the first $100,000.00 paid down on the loan.

After the lender had begun pursuing the guarantor it foreclosed on the collateral securing the loan, obtaining a total of $635,276.62, reducing the debt to $129,407.24. The guarantor argued that once the bank chose to foreclose, the proceeds of the foreclosure had to be applied to the principal, extinguishing his guaranty by its own terms, which stated that it applied only to the "first 100,000.00" of the principal debt. The Court agreed with the guarantor. The court concluded that,

> Paragraph nine of the guaranty states clearly that the guarantor's obligation shall be reduced by any paydown on the underlying note's principal. The term does not specify that the paydown need be made by the principal obligor, nor does it limit the paydown to monies paid in the ordinary course of monthly installments.

*Id.* at 639 A.2d 274.

CGLIC asks the Court to reject the reasoning of that case in favor of that offered by the 14th District Court of Appeals of Texas (Houston) in *University Savings Assn. v. Miller*, 786 S.W.2d 461 (Tex.App.1990). Miller was loaned $2,740,000.00. He executed a guaranty of the first, or top 10% of all sums owing on the debt. He defaulted. The bank demanded payment on the guaranty and foreclosed on the collateral real estate. Later, the bank bid in the property for $2,400,000.00, leaving a balance owed by Miller of $627,019.43. Miller argued that because the proceeds from the foreclosure sale reduced the outstanding principal by more than the 10% he guaranteed ($274,000.00), the guaranty agreement terminated. The court disagreed. As in the *BankEast* case, and as here, the guaranty clause contained a provision that Miller's guaranty was unconditional and did not require the lender to first foreclose on the collateral before acting on the guaranty. However, the guaranty also explicitly provided that the lender, upon a foreclosure, was not required to apply the proceeds from the collateral to the unguaranteed portion of the debt before applying it to the

indebtedness guaranteed by Miller. *Miller* at 786 S.W.2d 463. Thus, the appellate court concluded that the trial court, which had granted summary judgment to Miller, had incorrectly construed the guaranty.

This Court finds the reasoning of *BankEast* more persuasive than that of *Miller*, and that the facts of the latter include a significant distinction from those present. The guaranty in *Miller* specifically provided that in the event of foreclosure, the lender was not required to apply the proceeds of the foreclosure sale to reduce the guarantor's obligation. No such provision, which explicitly contemplates the result of a foreclosure upon the guarantors' obligation, exists here.

### Conclusion

■■■ Guaranty agreements are to be strictly construed and the language of a guaranty clause must be interpreted most strongly against the person at whose insistence it was written in the contract. *Housatonic Bank and Trust Co. v. Fleming*, 234 N.J.Super. 79, 560 A.2d 97 (App.Div.1989); *Josefowicz v. Porter*, 32 N.J.Super. 585, 108 A.2d 865 (App.Div.1954); *First Bank and Trust Co. v. Siegel*, 36 N.J.Super. 207, 210, 115 A.2d 152 (Law Div.1955). The guarantor cannot be held liable beyond the strict terms of his contract. *Id.*

■■■ Furthermore, this Court cannot, and will not, give the parties to a contract more favorable terms than those that bargained for and codified in a clear and unambiguous document.

The guaranty agreement provided that the defendants were unconditionally liable for the "top $3 million" of an $11 million loan. The contract explicitly stated that the amount of the debt guaranteed was to be reduced, dollar for dollar, for every reduction in the principal debt, "from whatever source." The principal debt was reduced by operation of New Jersey's fair market credit rule applied to the foreclosure. While CGLIC contends that this interpretation belies their understanding of the guaranty agreement, it reflects the only way in which the contract reasonably can be construed. If CGLIC had wanted the amount of defendants' guaranty to be reduced by reduction

in the principal debt from whatever source, *except* by foreclosure, it could have so stated in the guaranty. It did not. As explained by the Appellate Division of New Jersey's Superior Court,

> Where the terms of a contract are clear and unambiguous, there is no room for interpretation or construction and the courts must enforce those terms as written. The court has no right to rewrite the contract merely because one might conclude that it might well have been functionally desirable to draft it differently. Nor may the courts remake a better contract for the parties than they themselves have seen fit to enter into, or to alter it for the benefit of one party and to the detriment of another.

*Karl's Sales & Service, Inc. v. Gimbel Brothers, Inc.*, 249 N.J.Super. 487, 592 A.2d 647 (App.Div.1991) (citations omitted).

The guarantors' motion for summary judgment therefore is GRANTED, dismissing CGLIC's complaint.

### ORDER

This matter having been opened to the Court by Budd Larner Gross Rosenbaum Greenberg & Sade, P.C. (Dennis M. Reznick, Esq. appearing), attorneys for defendants Herbert Punia, Leonard Punia and Bernard Weissman, in the presence of Barry & McMoran, P.C. (Salvatore T. Alfano, Esq. appearing), attorneys for plaintiff Connecticut General Life Insurance Company, upon defendants' motion to enter summary judgment pursuant to Fed.R.Civ.Pro. 56, and the Court having considered the papers submitted in support of and in opposition to defendants' application and having heard oral argument in open court, and for good cause shown.

IT IS on this 25th day of April 1995;

ORDERED, as follows:

1. Defendants' motion for summary judgment pursuant to Fed.R.Civ.Pro. 56 is hereby granted.

2. Plaintiff's complaint is hereby dismissed with prejudice.

3. Defendants' attorney shall serve a copy of this Order upon all other counsel of record within seven days hereof.