649 A.2d 1253

BELINDA MURRAY AND ELRICK A. MURRAY, M.D., PLAIN-TIFFS–RESPONDENTS, v. MICHAEL ANDREW LAWSON, DAVID CRIST, JANE DOE (A FICTITIOUS NAME) AND JOHN DOE (A FICTITIOUS NAME), DEFENDANTS–APPELLANTS.

Argued November 7, 1994—Decided December 1, 1994.

208

*Richard F. Collier, Jr.,* argued the cause for appellants.

*Pamela Mandel* argued the cause for respondents.

*Frank L. Corrado* argued the cause for *amicus curiae* American Civil Liberties Union of New Jersey (*Rossi, Barry, Corrado, Grassi & Radell* and *Marsha Wenk,* attorneys; *Mr. Corrado* and *Ms. Wenk,* on the briefs).

*Charles J. Walsh* argued the cause for *amicus curiae* The American College of Obstetricians and Gynecologists (*Sills, Cummis, Zuckerman, Radin, Tischman, Epstein & Gross,* attorneys; *Mr. Walsh* and *Steven R. Rowland,* of counsel and on the letter briefs).

*Andrea M. Silkowitz,* Assistant Attorney General, argued the cause for *amicus curiae* Attorney General of New Jersey (*Debo-*

rah T. Poritz, Attorney General, attorney; Jaynee Lavecchia, Assistant Attorney General, of counsel).

Dara Klassel, a member of the New Jersey and New York bars, submitted a brief on behalf of amici curiae Planned Parenthood Federation of America and Planned Parenthood Affiliates of New Jersey (Ansell, Zaro, Bennett and Grimm, attorneys; Ms. Klassel and Richard B. Ansell, on the brief).

The opinion of the Court was delivered by

CLIFFORD, J.

In Murray v. Lawson, 136 N.J. 32, 642 A.2d 338 (1994), this Court upheld an injunction prohibiting defendants, anti-abortion protestors, from picketing within 300 feet of the residence of plaintiffs, a physician who performs abortions and the physician's wife. We concluded that the injunction was a permissible time, place, and manner restriction on defendants' speech. Thereafter, the United States Supreme Court announced its decision in Madsen v. Women's Health Center, Inc., 512 U.S. ——, 114 S.Ct. 2516, 129 L.Ed.2d 593 (1994), which held impermissible under a stricter constitutional standard an injunction prohibiting anti-abortion protestors from picketing within 300 feet of the residence of any owner, agent, staff member, or employee of the defendant in that case, a clinic at which abortions are performed.

The Murray defendants petitioned the United States Supreme Court for a writ of certiorari. The Supreme Court granted certiorari, vacated our earlier judgment, and remanded the cause to this Court "for further consideration in light of Madsen." —— U.S. ——, ——, 115 S.Ct. 44, 44, 130 L.Ed.2d 6, —— (1994). Having revisited our earlier decision, we are persuaded that the 300–foot restriction we upheld in Murray cannot remain in place and that we must alter the terms of the injunction.

I

The facts are set forth in detail in Murray, supra, 136 N.J. at 36–40, 642 A.2d 338. We repeat here only those facts that are relevant to the remand from the United States Supreme Court.

Plaintiff Dr. Elrick Murray is a licensed obstetrician and gynecologist with a private practice in Plainfield. Dr. Murray performs abortions at several hospitals and clinics in New Jersey. He and his wife, plaintiff Belinda Murray, live with their three children in a suburban neighborhood of Westfield. In 1991 the children were ages six, eleven, and fifteen. For about two years before January 1991, defendants regularly demonstrated against abortion by picketing at one of the clinics where Dr. Murray performs abortions.

On December 14, 1990, defendant Lawson, having discovered Dr. Murray's Westfield address, went to that address to determine whether it was current. Lawson was surprised to find a residence instead of an office. Lawson rang the doorbell and plaintiffs' then-fourteen-year-old son answered the door. After confirming that the house was the Murray residence, Lawson told the boy to tell his father to stop doing abortions. Mrs. Murray came to the door and told Lawson to leave and not to return. He left immediately. Mrs. Murray testified that the visit frightened and upset her.

About a month later, Lawson informed the Westfield police that approximately fifty people planned to picket peacefully outside the Murray residence on Sunday, January 20, 1991. The administrator of one of the clinics at which Dr. Murray worked warned him about the protest. On the advice of the Westfield police, Dr. Murray sent his family away for the day but he remained at home.

On January 20 two police officers met the fifty-seven picketers at a nearby school, instructed them on basic picketing rules, and escorted them to the sidewalk in front of the Murray residence. The picketers walked in a single-file loop on the sidewalk in front of the Murray residence and in front of about ten surrounding houses. Defendants, walking generally two abreast but sometimes four or five abreast, carried signs that stated variously, "Dr. Murray scars women and kills their unborn children," "Elrick Murray pre-born baby exterminator and nomad abortionist," and they exhibited a placard that showed a decapitated infant with the

caption "Elrick Murray, abortionist." Defendants also spoke to several neighbors including one teenager whom they asked whether he knew that a killer lived in the neighborhood.

In February 1991 plaintiffs filed suit in the Chancery Division seeking damages and injunctive relief against defendants, Lawson, Crist, and fictitiously-named others. The complaint charged Lawson with trespass and charged all defendants with disruption of plaintiffs' use and enjoyment of their property, intrusion on their seclusion, damage to Dr. Murray's professional reputation and pecuniary interests, and deprivation of the right to privacy under the State and federal constitutions. On February 8, 1991, the first scheduled hearing date of the case, defendants Lawson and Crist picketed for about fifteen minutes on the sidewalk in front of plaintiffs' residence and in front of other residences on the block.

After a hearing on February 14 and 22, 1991, the Chancery Division entered a temporary restraining order restricting the picketers from using the words "murderer" or "killer," from referring to members of the Murray family by name, from carrying the sign with the decapitated fetus, and from hand-delivering written material to residents of the neighborhood. The order also limited defendants' picketing to two persons, for one hour, every three weeks.

No demonstrators picketed at the Murray residence until May 4, 1991. On April 22, 1991, however, one of the clinics at which Dr. Murray performed abortions burned to the ground under circumstances that persuaded police and fire officials that the fire had been the work of an arsonist. Between April 22 and May 4, 1991, defendant Lawson picketed at another clinic and at Dr. Murray's office. On May 2, 1991, another clinic at which Dr. Murray performed abortions received a bomb threat, causing the police to evacuate the site. Authorities never determined who was responsible for the fire or for the bomb threat. Although no evidence linked defendants to the arson or to the warning of a bomb, the doctor felt threatened by and fearful of defendants.

On May 4, 1991, two days after the bomb threat, defendant Lawson and another picketer reappeared to picket in front of the Murray residence. Dr. Murray called the police. After the police arrived, the doctor came out of his house and engaged in a heated verbal exchange with the picketers. At the urging of the police, Dr. Murray returned to his house, but then emerged again and took a swing at Lawson. Dr. Murray was later convicted of simple assault in the Westfield Municipal Court.

After a final hearing, the Chancery Division entered a permanent injunction in July 1991, prohibiting "defendants and all persons in active concert or participation with them * * * from picketing in any form including parking, parading or demonstrating in any manner, within 300 feet of the Murray residence * * *." The court dismissed the claim of interference with Dr. Murray's profession, considered the claim for interference with use and enjoyment of property as subsumed under the tortious-invasion-of-privacy claim, found Lawson's trespass irrelevant to the picketing, and declined to award money damages for plaintiffs' invasion-of-privacy and intentional-infliction-of-emotional-distress claims.

Defendants appealed the trial court's issuance of the injunction. Plaintiffs did not cross-appeal the court's other rulings. In a published opinion, the Appellate Division upheld the 300–foot restriction, 264 *N.J.Super.* 17, 624 *A.*2d 3 (1993), finding that the trial court had the authority to issue the injunction and that the restrictions contained therein survived defendants' free-speech challenge.

We granted defendants' petition for certification, 133 *N.J.* 445, 627 *A.*2d 1149 (1993), and thereafter affirmed the Appellate Division's judgment upholding the injunction. We determined that the Chancery Division did have the authority to issue the injunction and that the 300–foot restriction contained therein was a permissible time, place, and manner restriction on defendants' speech. *Murray, supra,* 136 *N.J.* 32, 642 *A.*2d 338.

First, we concluded that the injunction was content neutral. We reasoned that although the injunction restricted the speech of only anti-abortion protestors, the Chancery Division had imposed it not because of the protestors' viewpoint but rather only because defendants' conduct had interfered with plaintiffs' residential privacy. *Id.* at 45–46, 642 *A.*2d 338. Next, we decided that protection of residential privacy constitutes a significant government interest justifying the imposition of injunctive restrictions. *Id.* at 47–49, 642 *A.*2d 338. To support that proposition we relied on our common law and on the United States Supreme Court decision in *Frisby v. Schultz*, 487 *U.S.* 474, 484, 108 *S.Ct.* 2495, 2502, 101 *L.Ed.*2d 420, 431 (1988) (concluding that protection of residential privacy is significant government interest). Finally, we found that the 300–foot ban had been narrowly tailored to promote that significant government interest in the protection of residential privacy. *Id.* at 51–53, 642 *A.*2d 338.

As ordered by the United States Supreme Court, we now reconsider the foregoing holdings in light of *Madsen, supra,* 512 *U.S.* ——, 114 *S.Ct.* 2516, 129 *L.Ed.*2d 593.

## II

Because *Madsen* necessarily determines the outcome here, we outline the Court's opinion in that case in some detail. In *Madsen,* the respondents operated abortion clinics throughout central Florida, including one such clinic on a highway called "Dixie Way" in Melbourne. The petitioners, anti-abortion protestors, picketed and demonstrated outside the clinic. 512 *U.S.* at ——, 114 *S.Ct.* at 2521, 129 *L.Ed.*2d at 603. In September 1992 a Florida state court issued a permanent injunction prohibiting the protestors "from blocking or interfering with public access to the clinic, and from physically abusing persons entering or leaving the clinic." *Id.* at ——, 114 *S.Ct.* at 2521, 129 *L.Ed.*2d at 603. Six months later, the clinic sought to expand the restrictions. *Id.* at ——, 114 *S.Ct.* at 2521, 129 *L.Ed.*2d at 603. The trial court made additional findings of fact and issued a broader injunction, which

the Florida Supreme Court upheld and which eventually became the subject of the United States Supreme Court's ruling in *Madsen.*

In respect of the protestors' continued activities at the clinic despite the existence of the earlier injunction, the trial court found that the protestors had "continued to impede access to the clinic by congregating on the paved portion of the street—Dixie Way—leading up to the clinic, and by marching in front of the clinic's driveways." *Id.* at ——, 114 *S.Ct.* at 2521, 129 *L.Ed.*2d at 603. Vehicles attempting to enter the clinic's parking lots had to reduce speed to allow the protestors to move out of the way, and as they slowed, sidewalk counselors would approach the vehicles and attempt to give the occupants antiabortion literature, and would urge them not to use the clinic's services. *Id.* at ——, 114 *S.Ct.* at 2521, 129 *L.Ed.*2d at 603. The people outside the clinic, whose number varied from a mere handful to a throng of 400, would sing, chant, and use loudspeakers and bullhorns. *Id.* at ——, 114 *S.Ct.* at 2521, 129 *L.Ed.*2d at 603.

The trial court also found that the protestors' activities had affected the health of the clinic's patients. The difficulty in gaining access to the clinic had made the patients more anxious and tense, thereby requiring that they receive more sedation before undergoing surgical procedures, which in turn increased the risk of such procedures. Moreover, patients inside the clinic could hear the noise from the protests, a circumstance that caused more stress during the procedures and during recovery. Finally, for those patients who chose not to enter the clinic because of the crowd, the risks to their health were increased by the delay. *Id.* at ——, 114 *S.Ct.* at 2521, 129 *L.Ed.*2d at 603.

The trial court also made findings related to the protestors' activities at the residences of the clinic's staff. The Florida Supreme Court appended to its own opinion the trial court's specific factual findings:

G. On other occasions since the entry of the injunction * * *, the respondent * * * and others in concert with him approached the private residences or

temporary lodging places of clinic employees. These approaches included not only direct communication with the occupants (sometimes the 'home alone', minor children of the occupants), but also carrying signs, walking up and down on the sidewalk or street in front of the residence, shouting at passersby, contacting (ringing doorbells of) neighbors, and providing literature identifying the clinic employee as a 'baby killer'.

H. On one occasion the respondent * * * with others went to the vicinity of the motel where a staff physician was temporarily staying and demonstrated. While respondent * * * remained outside just off the premises of the motel, others went upon the premises of the motel, some entering the motel lobby, yelling 'child murderer' and 'baby killer'. The doctor testified that as a result of such activity his departure for the clinic was delayed by one-half hour.

[626 *So.*2d 664, 677–78 (1993).]

Based on those findings, the trial court determined that the restraints imposed by its initial injunction were insufficient. See *Madsen, supra,* 512 *U.S.* at ——, 114 *S.Ct.* at 2521, 129 *L.Ed.*2d at 604. Accordingly, the trial court expanded the injunction on activities at the clinic by providing that the protestors were prohibited from entering the clinic's premises; from blocking access to the clinic; from picketing within thirty-six feet of the clinic's property line; from making sounds or showing images that could be heard or seen inside the clinic; from approaching physically, within 300 feet of the clinic, any person seeking to use the clinic's services (unless such person indicates a desire to speak to the protestors); and from assaulting owners, staff, or patients of the clinic. *Id.* at ——, 114 *S.Ct.* at 2521–22, 129 *L.Ed.*2d at 604–05.

The trial court's expanded injunction also included restrictions protecting the clinic's owners, agents, staff, and employees at their homes. It prohibited the protestors

[a]t all times on all days, from approaching, congregating, picketing, patrolling, demonstrating or using bullhorns or other sound amplification equipment within three-hundred (300) feet of the residence of any of the [clinic's] employees, staff, owners or agents, or blocking or attempting to block, barricade, or in any other manner, temporarily or otherwise, obstruct the entrances, exits or driveways of the residences of any of the [clinic's] employees, staff, owners or agents. The [protestors] and those acting in concert with them are prohibited from inhibiting or impeding or attempting to impede, temporarily or otherwise, the free ingress or egress of persons to any street that provides the sole access to the street on which those residences are located.

[626 *So.*2d at 680.]

The Supreme Court of Florida upheld all portions of the expanded injunction against a free-speech challenge. 626 *So.*2d 664 (1993). After granting certiorari, 510 *U.S.* ——, 114 *S.Ct.* 907, 127 *L.Ed.*2d 98 (1994), the United States Supreme Court upheld some provisions of the injunction and struck down others. First, the Court determined that the injunction was not content based, even though the injunction restricted the speech of only the anti-abortion protestors. The Court reasoned that the injunction was not an expression of hostility toward the protestors' message but a response to the protestors' repeated violations of the trial court's original order. *Madsen, supra,* 512 *U.S.* at ——, 114 *S.Ct.* at 2523–24, 129 *L.Ed.*2d at 606. Accordingly, the Court found that strict scrutiny was not the appropriate standard by which the Court should analyze the constitutionality of the injunction. *Id.* at ——, 114 *S.Ct.* at 2524, 129 *L.Ed.*2d at 607.

The Court then noted that if the underlying controversy had challenged a generally-applicable statute instead of an injunction, the Court "would determine whether the time, place, and manner regulations were 'narrowly tailored to serve a significant governmental interest.'" *Id.* at ——, 114 *S.Ct.* at 2524, 129 *L.Ed.*2d at 607 (quoting *Ward v. Rock Against Racism,* 491 *U.S.* 781, 791, 109 *S.Ct.* 2746, 2753, 105 *L.Ed.*2d 661, 675 (1989)). However, focusing on the differences between injunctions and generally-applicable statutes, the Court found that a different standard was required. A statute results from a legislative choice regarding the promotion of a specific societal interest, but an injunction "can be tailored by a trial judge to afford more precise relief than a statute where a violation of the law has already occurred." *Id.* at ——, 114 *S.Ct.* at 2524, 129 *L.Ed.*2d at 607. Because "[i]njunctions also carry greater risks of censorship and discriminatory application than do general ordinances," *id.* at ——, 114 *S.Ct.* at 2524, 129 *L.Ed.*2d at 607, they should be "no broader than necessary to achieve [their] desired goals." *Id.* at ——, 114 *S.Ct.* at 2525, 129 *L.Ed.*2d at 608. Accordingly, the Court determined that the test to be applied in the evaluation of a content-neutral injunction should be "whether

the challenged provisions of the injunction burden no more speech than necessary to serve a significant government interest." *Id.* at ——, 114 *S.Ct.* at 2525, 129 *L.Ed.*2d at 608.

Applying that test to the Florida clinic restrictions, the Court first agreed with the Florida Supreme Court's conclusion that numerous significant state interests justified the issuance of injunctive relief: "ensuring the public safety and order, * * * promoting the free flow of traffic on public streets and sidewalks, * * * protecting the property rights of all its citizens," *id.* at ——, 114 *S.Ct.* at 2526, 129 *L.Ed.*2d at 609, and securing medical privacy, *ibid.* The Court then turned to whether the specific restrictions imposed on the activity outside the clinic burdened more speech than necessary to serve those goals.

The Court upheld two of the restrictions on the protestors' activities around the clinic. First, it upheld the validity of the thirty-six-foot buffer zone, finding that "[t]he state court seems to have had few other options to protect access given the narrow confines around the clinic." *Id.* at ——, 114 *S.Ct.* at 2527, 129 *L.Ed.*2d at 610. The Court also recognized that although "[t]he need for a complete buffer zone near the clinic entrances and driveway may be debatable, * * * some deference must be given to the state court's familiarity with the facts and the background of the dispute between the parties even under our heightened review." *Id.* at ——, 114 *S.Ct.* at 2527, 129 *L.Ed.*2d at 610–11. The Court also upheld the noise restrictions, finding that they "burden[ed] no more speech than necessary to ensure the health and well-being of the patients at the clinic." *Id.* at ——, 114 *S.Ct.* at 2528, 129 *L.Ed.*2d at 612.

The Supreme Court also struck down several of the injunctive order's restrictions. For example, the Court found unconstitutional that portion of the thirty-six-foot-buffer-zone restriction that included private property, concluding that that restriction "burden[ed] more speech than necessary to protect access to the clinic." *Id.* at ——, 114 *S.Ct.* at 2528, 129 *L.Ed.*2d at 612. The Court also struck down the images-observable-within-the-clinic

restriction, determining that it burdened more speech than necessary to protect the patients and their families; the clinic could merely pull its curtains so that patients could avoid seeing images that they found disagreeable. *Id.* at ——, 114 *S.Ct.* at 2529, 129 *L.Ed.*2d at 612–13. Finally, the Court found impermissible the prohibition on physically approaching patients within 300 feet of the clinic (unless the patients indicated a desire to be approached), concluding that it too "burden[ed] more speech than necessary to prevent intimidation and to ensure access to the clinic." *Id.* at ——, 114 *S.Ct.* at 2529, 129 *L.Ed.*2d at 613.

Moving to the residential restrictions, the Court first noted that the same analysis that applied to the noise restrictions around the clinic applied to the noise restrictions around the residences. *Id.* at ——, 114 *S.Ct.* at 2529, 129 *L.Ed.*2d at 613–14. Then the Court struck down the restriction prohibiting picketing within a 300–foot zone around the residences of clinic owners, agents, staff, and employees. The Court noted that in *Frisby, supra,* 487 *U.S.* at 484, 108 *S.Ct.* at 2502, 101 *L.Ed.*2d at 431, it had previously recognized that the protection of residential privacy is a State interest of the highest order. *Id.* at ——, 114 *S.Ct.* at 2529–30, 129 *L.Ed.*2d at 614. But it found that the restriction in *Madsen* burdened more speech than necessary to protect that interest:

> [T]he 300–foot zone around the residences in this case is much larger than the zone provided for in the ordinance which we approved in *Frisby.* * * *. The prohibition was limited to 'focused picketing taking place solely in front of a particular residence.' By contrast, the 300–foot zone would ban '[g]eneral marching through residential neighborhoods, or even walking a route in front of an entire block of houses.' *The record before us does not contain sufficient justification for this broad a ban on picketing; it appears that a limitation on the time, duration of picketing, and number of pickets outside a smaller zone could have accomplished the desired result.*
>
> [*Id.* at ——, 114 *S.Ct.* at 2530, 129 *L.Ed.*2d at 614 (quoting *Frisby, supra,* 487 *U.S.* at 483, 108 *S.Ct.* at 2502, 101 *L.Ed.*2d at 431) (emphasis added).]

Finally, the Court rejected vagueness and overbreadth challenges to the injunction as well as a freedom-of-association challenge. *Id.* at ——, 114 *S.Ct.* at 2530, 129 *L.Ed.*2d at 614. We note, too, that three Justices would have found the injunction content-based and would have used the strict-scrutiny standard to

determine whether the injunction in *Madsen* passed muster under the First Amendment, see *id.* at —— – ——, 114 *S.Ct.* at 2537–40, 129 *L.Ed.*2d at 623–27 (Scalia, J., joined by Kennedy and Thomas, JJ., concurring in judgment in part and dissenting in part), and that another Justice would have adopted a more lenient standard than that enunciated by the majority in determining whether an injunction survives a free-speech challenge, see *id.* at ——, 114 *S.Ct.* at 2531–34, 129 *L.Ed.*2d at 615–16 (Stevens, J., concurring in part and dissenting in part).

### III

First, we address defendants' claim that this Court should not apply *Madsen* at all because unlike the injunction in that case, the injunction at issue here is a "prior restraint" on speech and thus presumptively unconstitutional. That argument is based on a footnote in the United States Supreme Court's opinion in *Madsen:*

> We also decline to adopt the prior restraint analysis urged by petitioners. Prior restraints do often take the form of injunctions. Not all injunctions which may incidentally affect expression, however, are "prior restraints" in the sense that that term [i]s used [in earlier opinions of the Court]. Here petitioners are not prevented from expressing their message in any one of several different ways; they are simply prohibited from expressing it within the 36-foot buffer zone. Moreover, the injunction was not issued because of the content of petitioners' expression but because of their prior unlawful conduct.
>
> [512 *U.S.* at —— n. 2, 114 *S.Ct.* at 2524 n. 2, 129 *L.Ed.*2d at 607 n. 2 (citations omitted).]

Defendants argue that because no unlawful conduct occurred in this case, the Murray injunction must necessarily be evaluated under prior-restraint doctrine and not under the standard that the Court applied in *Madsen.* Thus, defendants assert, "In determining which standard of review applies, the crucial distinction is whether * * * the challenged injunction was based on a finding of 'prior unlawful conduct.'" We do not agree.

Generally, "[t]he term prior restraint is used 'to describe administrative and judicial orders *forbidding* certain communications when issued in advance of the time that such communications are to occur.'" *Alexander v. United States,* 509 *U.S.* ——, ——,

113 *S.Ct.* 2766, 2771, 125 *L.Ed.*2d 441, 450 (1993) (quoting M. Nimmer, *Nimmer on Freedom of Speech* § 4.03 at 4–14 (1984) ); *see also* Laurence H. Tribe, *American Constitutional Law* § 12–24 at 1040 (2d ed. 1988) (noting that central feature of prior restraint is "attempt[ ] to suppress speech prior to publication * * *"). Injunctions are often "classic examples of prior restraints." *Alexander, supra,* 509 *U.S.* at ——, 113 *S.Ct.* at 2771, 125 *L.Ed.*2d at 450. But as the Supreme Court noted in *Madsen,* not all injunctions that "incidentally affect expression * * * are 'prior restraints' * * *." 512 *U.S.* at —— n. 2, 114 *S.Ct.* at 2524 n. 2, 129 *L.Ed.*2d at 607 n. 2.

▆▆▆ Although never outlining a precise test, the Supreme Court has considered a number of factors in determining whether a restriction is a prior restraint. One of those factors is whether the restraint prevents the expression of a message. *See ibid.* ("Here petitioners are not prevented from expressing their message in any one of several different ways; they are simply prohibited from expressing it within the 36–foot buffer zone."); *Alexander, supra,* 509 *U.S.* at ——, 113 *S.Ct.* at 2771, 125 *L.Ed.*2d at 450 (finding that order requiring petitioner to forfeit property related to racketeering activity was not prior restraint because it "does not *forbid* petitioner from engaging in any expressive activities in the future, nor does it require him to obtain prior approval for any expressive activities"). Thus, the Supreme Court has consistently found (often without discussion) that injunctions are prior restraints if they forbid entirely the publication of a message. Examples of cases involving prior restraints are *CBS, Inc. v. Davis,* 510 *U.S.* ——, 114 *S.Ct.* 912, 127 *L.Ed.*2d 358 (1994) (enjoining CBS from airing video taken at meat-packing company); *National Socialist Party of America v. Village of Skokie,* 432 *U.S.* 43, 97 *S.Ct.* 2205, 53 *L.Ed.*2d 96 (1977) (enjoining petitioners from marching, walking, parading, distributing pamphlets, or displaying materials within town); *Nebraska Press Ass'n v. Stuart,* 427 *U.S.* 539, 96 *S.Ct.* 2791, 49 *L.Ed.*2d 683 (1976) (enjoining news media from publishing or broadcasting accounts of defendant's

confessions and admissions until jury was impaneled); *New York Times Co. v. United States*, 403 *U.S.* 713, 91 *S.Ct.* 2140, 29 *L.Ed.*2d 822 (1971) (attempting to enjoin newspapers from publishing contents of classified study regarding decision-making process on United States' Vietnam policy); *Carroll v. President & Commissioners of Princess Anne*, 393 *U.S.* 175, 89 *S.Ct.* 347, 21 *L.Ed.*2d 325 (1968) (restraining white supremist organization from rallying). However, "The Court frequently finds that regulations with only indirect or minor effects on speech are not really prior restraints at all." Tribe, *supra*, § 12–36 at 1051 n. 37. See, *e.g.*, *Arcara v. Cloud Books, Inc.*, 478 *U.S.* 697, 705 n. 2, 106 *S.Ct.* 3172, 3177 n. 2, 92 *L.Ed.*2d 568, 577 n. 2 (1986) (noting that closure of adult bookstore differs from prior restraint because "order would impose no restraint at all on the dissemination of particular materials, since respondent is free to carry on his bookselling business at another location * * *"); *Seattle Times Co. v. Rhinehart*, 467 *U.S.* 20, 34, 104 *S.Ct.* 2199, 2208, 81 *L.Ed.*2d 17, 27 (finding that order prohibiting dissemination of information obtained through discovery before trial is not prior restraint because "the party may disseminate the identical information covered by the protective order as long as the information is gained through means independent of the court's processes"), *cert. denied*, 467 *U.S.* 1230, 104 *S.Ct.* 2690, 81 *L.Ed.*2d 884 (1984).

The injunction at issue here, like the *Madsen* injunction, does not forbid defendants from expressing their message; they are simply prohibited from expressing it by picketing within the 300–foot zone that the injunction establishes. Defendants can picket on the remainder of the Murrays' block (the injunction bans picketing within 300 feet of the Murray residence and the block on which they live is 1800 feet long); throughout the rest of the neighborhood; and at the offices, clinics, and hospitals out of which Dr. Murray works. Moreover, as *amicus curiae* American College of Obstetricians and Gynecologists asserts, the injunction does not preclude defendants from engaging in other forms of communication even within the protected zone. *Amicus curiae* Attorney General points out that the injunction does not preclude

distributing leaflets or engaging in door-to-door canvassing. Only the picketing targeted at the Murray residence was prohibited because only that activity was found inherently and offensively to interfere with plaintiffs' residential privacy.

■ Another factor in determining whether a restriction imposes a prior restraint on speech is whether the injunction was issued because of the content of the expression. *See Madsen, supra*, 512 *U.S.* at —— n. 2, 114 *S.Ct.* at 2524 n. 2, 129 *L.Ed.*2d at 607 n. 2 ("Moreover, *the injunction was issued not because of the content of petitioners' expression * * * but because of their prior unlawful conduct.*" (emphasis added)). In *Southeastern Promotions, Ltd. v. Conrad*, 420 *U.S.* 546, 95 *S.Ct.* 1239, 43 *L.Ed.*2d 448 (1975), the Court emphasized that licensing or regulatory systems that focus on content are invalid prior restraints because they result in censorship. The issue in *Southeastern Promotions, Ltd.* was "whether First Amendment rights were abridged when respondents denied petitioner the use of a municipal facility in Chattanooga, Tennessee, for the showing of the controversial rock musical 'Hair.'" *Id.* at 547, 95 *S.Ct.* at 1241, 43 *L.Ed.*2d at 452. The Court found that the system by which the Chattanooga Board regulated the use of its facilities resulted in prior restraints on speech because it did not operate pursuant to acceptable standards. "One seeking to use a theater was required to apply to the board. The Board was empowered to determine whether the applicant should be granted permission * * * *on the basis of its review of the content of the production.*" *Id.* at 554, 95 *S.Ct.* at 1244, 43 *L.Ed.*2d at 456–57 (emphasis added). The Court's finding of a prior restraint in that case reflected society's "distaste for censorship." *Id.* at 553, 95 *S.Ct.* at 1244, 43 *L.Ed.*2d at 456.

■ The injunction here, however, was not entered because of the content of defendants' message, despite defendants' and *amicus curiae* American Civil Liberties Union of New Jersey's (ACLUNJ's) strong protestations to the contrary. Defendants and ACLUNJ assert that the Supreme Court's opinion in *Madsen* requires this Court to find that if an injunction affecting speech is

not issued to remedy a past or threatened violation of the law, no basis other than the content of the speech exists to justify the regulation. That is not at all the case. We are not persuaded that our conclusion in *Murray, supra*, 136 *N.J.* at 45, 642 *A.*2d 338, that the injunction at issue is content neutral was error.

Although not imposed to remedy unlawful conduct, this injunction is justified on a basis other than the content of defendants' speech: the court granted it to protect the Murrays from targeted picketing that inherently and offensively interfered with their residential privacy. Thus, the injunction was entered pursuant to the court's authority to grant equitable relief to enforce a valid public policy of this State. *See id.* at 42–44, 642 *A.*2d 338. As the Court has noted in the labor-picketing context, "a State, in enforcing some public policy, * * * whether announced by its legislature or its courts, could constitutionally enjoin peaceful picketing aimed at preventing effectuation of that policy." *International Bhd. of Teamsters v. Vogt, Inc.*, 354 *U.S.* 284, 293, 77 *S.Ct.* 1166, 1171, 1 *L.Ed.*2d 1347, 1353, *reh'g denied*, 354 *U.S.* 945, 77 *S.Ct.* 1423, 1 *L.Ed.*2d 1558 (1957). In *Murray*, we gave detailed consideration to the public policy favoring protection of residential privacy and explained why that policy is sufficiently strong to implicate a significant government interest, 136 *N.J.* at 47–50, 642 *A.*2d 338, and we need not repeat that discussion here. Moreover, the United States Supreme Court confirmed in *Madsen* that protection of residential privacy is a significant government interest. 512 *U.S.* at ——, 114 *S.Ct.* at 2530, 129 *L.Ed.*2d at 614 (stating that " ' "[t]he State's interest in protecting the well-being, tranquility, and privacy of the home is certainly of the highest order." ' " (quoting *Frisby, supra*, 487 *U.S.* at 484, 108 *S.Ct.* at 2502, 101 *L.Ed.*2d at 431 (quoting *Carey v. Brown*, 447 *U.S.* 455, 471, 100 *S.Ct.* 2286, 2296, 65 *L.Ed.*2d 263, 276 (1980))).

We also reject defendants' other arguments that the injunction is content based. Our analysis in *Murray*, 136 *N.J.* at 45–47, 642 *A.*2d 338, which concludes that an injunction is not necessarily aimed at content merely because it restrains only a

specific group of speakers, appears to be entirely consistent with *Madsen.* See 512 *U.S.* at ——, 114 *S.Ct.* at 2524, 129 *L.Ed.*2d at 606 ("In short, the fact that the injunction covered people with a particular viewpoint does not itself render the injunction content or viewpoint based."). We reject as well the argument that the trial court entered the injunction here because of the Murrays' reaction to the content of defendants' speech. As the trial court noted, "the [c]ourt is assessing whether defendants have intruded into plaintiffs' privacy, not whether plaintiffs are disgruntled by what defendants are expressing."

In sum, this injunction is not a pre-publication restraint or the result of a discriminatory licensing or regulatory system, characteristics of cases invalidated under prior-restraint doctrine; nor does the injunction forbid defendants from expressing their message or restrict their activities merely because of the position that their message articulates. Therefore, the injunction is not a "prior restraint." Even if that were not the case, however, this injunction would fall within at least one "established exception to the doctrine of prior restraint," *Southeastern Promotions, Ltd., supra,* 420 *U.S.* at 555, 95 *S.Ct.* at 1245, 43 *L.Ed.*2d at 457, in that it would be permissible to protect a "captive audience." *Id.* at 556, 95 *S.Ct.* at 1245, 43 *L.Ed.*2d at 457. As the Supreme Court noted in *Frisby, supra,* targeted residential picketing can make residents captive listeners within their homes, and therefore "protection of the unwilling listener" is an important component of residential privacy. 487 *U.S.* at 484, 108 *S.Ct.* at 2502, 101 *L.Ed.*2d at 431; *see also* Hazel A. Landwehr, Note, *Unfriendly Persuasion: Enjoining Residential Picketing,* 43 *Duke L.J.* 148, 158 (1993) (noting that State's "ability to control the flow of ideas into the home is based not only on a concern for preserving the sanctity of the home but also on a recognition that homeowners present a captive audience for speakers").

## IV

We now turn to the question whether the injunction that we upheld in *Murray,* prohibiting picketing within 300 feet of the

Murray residence, runs afoul of *Madsen*. We conclude that as currently structured, the injunction does not satisfy the stricter standards that the United States Supreme Court announced in *Madsen*.

 That the injunction at issue here is content neutral and that it serves a significant government interest in protecting residential privacy is beyond question. See *supra* at 223–226, 649 A.2d at 1262–1263 (discussing reasons that this injunction meets *Madsen*'s requirements of content neutrality and significant government interest). Therefore we proceed to the more difficult question: whether the injunction burdens more speech than necessary to serve that interest. In *Murray*, we held that the restriction banning picketing within 300 feet of the Murray residence was narrowly tailored to protect plaintiffs' residential privacy. *Id.* at 51–53, 642 A.2d 338. But the standard enunciated in *Madsen* is more stringent. We conclude that under that stricter standard a 300–foot speech-free zone cannot be sustained on this record. However, recognizing the desirability of bringing these proceedings to a conclusion, we choose not to remand for further hearings but rather to modify the injunction consistent with our understanding of the dictates of *Madsen*.

To repeat, in *Madsen*, to justify the 300–foot restriction around the residences of all owners, agents, staff, and employees of the clinic, the trial court made only the following findings in respect of the protestors' activities:

G. On other occasions since the entry of the injunction * * *, the respondent * * * and others in concert with him approached the private residences or temporary lodging places of clinic employees. These approaches included not only direct communication with the occupants (sometimes the 'home alone', minor children of the occupants), but also carrying signs, walking up and down on the sidewalk or street in front of the residence, shouting at passersby, contacting (ringing doorbells of) neighbors, and providing literature identifying the clinic employee as a 'baby killer'.

H. On one occasion the respondent * * * with others went to the vicinity of the motel where a staff physician was temporarily staying and demonstrated. While respondent * * * remained outside just off the premises of the motel, others went upon the premises of the motel, some entering the motel lobby, yelling 'child

murderer' and 'baby killer'. The doctor testified that as a result of such activity his departure for the clinic was delayed by one-half hour.
[626 *So.*2d at 677–78.]

Noticeably absent in those findings is any reference to, much less any detailed description of, the physical surroundings of the residences of the owners, agents, staff, and employees of the clinic. The findings recited above appear to indicate only that some of those persons lived in houses in residential neighborhoods and in motels, and that the protestors picketed and protested at several locations. Nothing specific in those findings showed that a 300–foot restriction was necessary in every (or even in any single) instance to protect the privacy of the residents. Finding that "[t]he record before us does not contain sufficient justification for this broad a ban on picketing," the United States Supreme Court therefore vacated the injunction, 512 *U.S.* at ——, 114 *S.Ct.* at 2530, 129 *L.Ed.*2d at 614, at the same time pointedly observing that "a limitation on the time, duration of picketing, and number of pickets *outside a smaller zone* could have accomplished the desired result." *Ibid.* (emphasis added).

In sharp contrast to the sparse findings of the state court in *Madsen,* however, is the well-developed record before us in this case. The record demonstrates that defendants' conduct invaded the Murrays' residential privacy and that therefore some form of injunctive relief was necessary to protect plaintiffs' interest. Even defendants recognized at oral argument that peaceful *targeted* picketing can be enjoined to prevent the invasion of residential privacy. As the ACLU acknowledged, one aspect of heightened concern in this case was the fact that during the original picketing, although defendants marched a route of approximately ten houses, at no time was the area in front of plaintiffs' house free from picketers. Thus, injunctive relief is necessary here to protect plaintiffs from being "under siege" by defendants. The question then becomes whether the 300–foot restriction is appropriate, and if not, whether the record before us is sufficient to enable us to rewrite the "buffer zone" provision to burden no more speech than is necessary to protect plaintiffs' residential privacy.

Although the trial court did not set forth its reasons for abandoning the preliminary injunction's restrictions (limiting picketing to two persons, every third week, for one hour) in favor of a 300–foot picket-free zone, the record fully supports the decision to impose some form of buffer. Unlike the trial court in *Madsen*, from the outset the trial court in this case gave painstaking consideration to the physical layout of the neighborhood and made an exhaustive appraisal of defendants' picketing. Even in its earliest hearing in the case, on February 8, 1991, on plaintiffs' application for a temporary restraint, the court was concerned with drafting an injunction tailored to the precise facts at issue:

> And for the record let me just say that I'm familiar generally with the street, although if I recall—I haven't been on it in awhile. If I recall correctly, it isn't a continuous street, it goes down to one street and stops and then if you're trying to find it you have to do like a dog leg and then you go down the street again and if I recall correctly, the neighborhoods are not identical. In other words, some blocks have very narrow lots and others have large lots.
>
> Now, I don't know what Dr. Murray has. I'd be very interested in knowing that because if this is on a block where all the frontages are a hundred or 200 feet wide, where there are less houses, as opposed to lots that are 40 or 50 feet wide, that would influence me simply because it might have some relationship to the concentration of people in a smaller area who want to relax on Sunday.

Instead of issuing a temporary restraint at that first hearing, however, the court continued the hearing to another date to allow defendants to submit further certifications. By the time of that subsequent hearing, the trial court had personally examined plaintiffs' neighborhood.

> I want to place on the record the fact that I drove down the street, the 900 block, and I think Dr. Murray's house is 917. I looked at his house from the outside and I looked at the houses on the block, on both sides of the street.
>
> * * * There [are] no vacant lots, it's not rural, it's strictly a suburban town, all improvements, improved street, curb, mostly sidewalks, but not entirely. It appears to me every lot has a one-family house on it. [I]t appears to me the lot sizes run anywhere from 65 to 70 feet in frontage in that area. It's purely residential. * * *. [T]here's no commercial behind it or on either end of the block. * * *.
>
> * * * That Dr. Murray is entitled to reasonable peace and quiet without harassment, without intrusion, without offensive language [is clear], and to a lesser

extent the neighbors, but the neighbors are not my primary concern at this point * * *.

&ast; &ast; &ast; &ast; &ast; &ast; &ast; &ast;

And it seems to me we have to be realistic here and protect Dr. Murray to the extent that I can, consistent with the price we all pay for freedom and that is to put up with peaceable activities of others, whom we violently disagree with * * *.

Based on that and other evidence, including a videotape of the initial picketing outside plaintiffs' house, the court's temporary order limited the picketing to two persons, every third week, for one hour. The court thus concluded that the 300–foot restriction that plaintiffs had originally requested was "for the time being excessive." But the court also noted,

I'm going to allow them in front of the house on the public sidewalk. I will not require them, because it's only two, to be 50 or 300 feet away. Later on, when this—when the dust settles on this case, I would be more than happy to entertain a motion * * *, when I get a better feel for this case, if it's going to continue, to increase the number of pickets * * *. * * *.

And secondly, [the injunction might change] by virtue of a distance that I might increase when we increase, if we do increase, the number of pickets. * * *.

* * * [I]f I consider [allowing] more [picketers], I'm going to push you further away from the front of his house.

Before issuing its permanent injunction on July 25, 1991, the trial court heard testimony from plaintiffs and from several picketers, describing both plaintiffs' neighborhood and the picketing that had taken place. The court also viewed a number of photographs of the initial picketing. In imposing the 300–foot permanent order, the court noted:

[I]t is clear that the first amendment protection of defendant's picketing must be tailored in accordance with the plaintiff's privacy interests. The former cannot be paramount in all instances. This would defy its limited First Amendment protection. * * *. The latter cannot prevent expression completely.

In light of its authority to fashion an equitable remedy, this court will enjoin the defendants from picketing within 300 feet of the plaintiffs' residence. They may move through the neighborhood, but they cannot come within 300 feet of the Murray's home.

&ast; &ast; &ast; &ast; &ast; &ast; &ast; &ast;

In order that it be crystal clear, in referring to the tax map of the town of Westfield * * *, I note that Dr. Murray's house is on block 643 on lot 12 that he faces on Carlton Road, a distance which I have previously indicated. [Plaintiffs'

house is set back approximately twenty-five feet from the sidewalk on a 600-yard-long, thirty-three yard-wide block of Carlton Road.] That street is bounded by the intersection on the west by Grove Street, on the east by Clifton Street. On the remaining block in the back to the north is Central Avenue, which I take cognizance of the fact it is a rather busy street * * *. [H]owever, I'm satisfied based upon the pictures which are in evidence, based upon the testimony and the undisputed fact that Carlton Road itself is a completely residential street on both sides, so is Grove Street, so is Clifton Street. To the south is a street entitled The Boulevard. * * *. [T]he whole area * * * might be characterized, "the neighborhood," although I'm not limiting the neighborhood to those streets. I'm just trying to give anyone reading this opinion a rough idea of what the immediate neighborhood is like.

Consequently, absent any further legislative response from the Town of Westfield, this court will not restrict the peaceable picketing any further than what I have indicated. Such restrictions are consistent with the First Amendment protection afforded to defendants without intruding upon plaintiff's privacy.

The court entered a final order to that effect on July 25, 1991.

The foregoing recital demonstrates that the trial court developed an extensive record before making its determination: it watched a videotape and looked at pictures of the protesting; it heard the testimony of the picketers and the Murrays; it personally examined the residential street in question; and it consulted the town tax map. Moreover, the trial court was aware not only of unpleasant incidents that had preceded the issuance of the preliminary injunction (including one in which a neighbor of plaintiffs turned a sprinkler on the picketers and later received an unsigned postcard, never connected to defendants but nevertheless a source of concern to plaintiffs, warning that "people who live in wood houses shouldn't waste water") but also of the confrontation between Dr. Murray and the picketers that culminated in Murray's assault on Lawson. Those circumstances were therefore sufficiently lacking in serenity as to justify the trial court's adoption of a bright-line zone to eliminate confusion.

Missing from this record, however, is any explanation of why the trial court chose a picket-free zone of precisely 300 feet. When asked at oral argument what in the record justified such a large free zone, plaintiffs' reply was only that this Court should defer to the trial court. *Amicus curiae* American college of Obstetricians and Gynecologists asserted that if the trial court had

known at the time of its decision the "talismanic" words "burdens no more speech than necessary," it would have used them. On our review under the Supreme Court's more stringent standard, those responses are hardly satisfactory.

Defendants suggested at oral argument that cases from other courts imposing large picketing-free zones in residential areas had convinced the trial court that a 300–foot zone would be permissible. For example, on September 14, 1990, another Chancery Division court had imposed a temporary restraining order in *Boffard v. Barnes,* prohibiting anti-abortion protestors from picketing within 200 feet of the cul-de-sac on which was located the residence of a physician who performs abortions. (The preliminary and permanent injunctions, however, issued after the trial court's order herein, ultimately prohibited picketing "within the immediate vicinity" of the plaintiffs' residence.) 248 *N.J.Super.* 501, 591 *A.*2d 699 (1991), *aff'd in part and rev'd in part,* 264 *N.J.Super.* 11, 624 *A.*2d 1 (App.Div.1993), *aff'd as modified and remanded,* 136 *N.J.* 32, 642 *A.*2d 338 (1994). And in a Texas case the court upheld a ban prohibiting picketing within 400 feet of a physician's residence. *Valenzuela v. Aquino,* 800 *S.W.*2d 301 (Ct.App.1990), *aff'd in part and rev'd in part,* 853 *S.W.*2d 512 (1993). Although the trial court appropriately looked for guidance to decisions of other courts considering similar issues, an injunction must be crafted on a fact-specific basis. *See Horizon Health Ctr. v. Felicissimo,* 135 *N.J.* 126, 148, 638 *A.*2d 1260 (1994) ("Injunctions necessarily require an individualized balancing of rights."); *cf. R.* 4:52–4 (1994) (requiring that injunctions contain specific terms and describe in detail acts sought to be restrained).

The facts here lead us to the conclusion that a 300–foot restriction is too broad. As became clear at oral argument, if plaintiffs stayed within their residence or even walked out into their yard, the picketers and their placards would not likely be visible 300 feet away. Thus, keeping defendants at such a great distance, thereby rendering plaintiffs' awareness of the picketing most unlikely as a practical matter, is unnecessary to protect

plaintiffs' residential-privacy interest. We have before us, however, enough facts to permit us to tailor the restrictions appropriately, and the trial court would not likely be able to make any additional findings to aid in crafting those restrictions. Moreover, this Court's authority to modify injunctions to make them conform to law is well established. *See Horizon Health Ctr., supra*, 135 *N.J.* at 148, 638 *A.*2d 1260 ("When an injunction impermissibly exceeds applicable legal standards, appellate courts can modify or rewrite such an injunction to conform to those standards."); *see also Northeast Women's Ctr. v. McMonagle*, 939 *F.*2d 57, 67 (3d Cir.1991) ("We of course have the power to modify or even rewrite an injunctive order that exceeds permissible legal parameters."); *cf. New York Times Co. v. Sullivan*, 376 *U.S.* 254, 285, 84 *S.Ct.* 710, 728, 11 *L.Ed.*2d 686, 709 (1964) ("This Court's duty is not limited to the elaboration of constitutional principles; we must also in proper cases review the evidence to make certain that those principles have been constitutionally applied.").

In redrafting the injunction, we will follow the United States Supreme Court's invitation in *Madsen* to impose "a limitation on the time, duration of picketing, and number of pickets outside a *smaller* zone * * * [to] accomplish[ ] the desired result[, protecting plaintiffs' residential privacy]." *Id.* at ——, 114 *U.S.* at 2530, 129 *L.Ed.*2d at 614 (emphasis added). We note here that inasmuch as our modified injunction will impose a picket-free zone, albeit a zone smaller than 300 feet, we have declined to adopt defendants' and ACLU's position in respect of whether the injunction should contain a distance limitation at all. Those parties would have this Court require defendants to march a specific route (a loop from one end of the Murrays' block to the other), with the picketers walking a specified distance apart from each other to provide for periods during which the space in front of plaintiffs' house is free from picketers. Defendants and ACLU argue that no distance limitation, no matter how small, is permissible, because no conduct-based factors are present (*e.g.*, prior violation of a judicial order, or unlawful or disorderly conduct) to

warrant such relief. That view is inconsistent with our reading of *Madsen* that a smaller picket-free zone is permissible, even in the absence of such factors. Nowhere in their opinions did the Florida Supreme Court or the United States Supreme Court hinge their dispositions to the circumstance that the defendants in that case had engaged in violent, disorderly, or otherwise unlawful conduct outside the residences of the owners, agents, staff, or employees of the clinic. Moreover, a "free" zone here would provide for easier enforcement than would a complicated restriction of the type proposed by defendants and ACLU, given the limited resources dedicated to such matters and the need to ensure compliance with the injunction's terms.

Moving to the restriction itself, we do adopt many of defendants' and ACLU's other suggestions in respect of acceptable limitations on the number of picketers and the time and duration of the picketing, as well as a notification requirement. Thus, we replace the no-picketing-within–300–feet restriction that the trial court imposed and that we originally upheld under a less-stringent test in *Murray*, 136 *N.J.* 32, 642 *A.*2d 338, with the following:

Defendants and all those in active concert or participation with them:

(1) are prohibited at all times and on all days from picketing in any form within 100 feet of the property line of the Murray residence, located at 917 Carlton Road, Westfield, New Jersey;

(2) may picket in a group of no more than ten persons outside the 100–foot zone around the Murray residence for one hour every two weeks;

(3) must notify the Westfield police department at least twenty-four hours prior to any intended instance of picketing pursuant to this injunction of the number of picketers and of the time and duration of the intended picketing.

Under our understanding of *Madsen*, we conclude that the foregoing restrictions burden no more speech than necessary to protect plaintiffs' residential-privacy interest. A buffer of 100 feet is required here because it places the border of the zone approximately one-and-one-half lots away from the Murray residence; the Murrays will be free to enjoy their domestic tranquility inside their house, but if they choose to go out into their yard, they will see the picketers a mere lot-and-a-half away. Thus, defendants will be able to get their message across (if plaintiffs desire to look at it) but the modest buffer will relieve plaintiffs of

the feeling that they are prisoners within their own home. Limiting the number of picketers to ten will prevent plaintiffs from feeling besieged by defendants, but will also assuage defendants' concern that if only a few picketers are allowed, the picketing will not be taken seriously by those viewing it because they would perceive the message to represent a marginal viewpoint. Further, the picketing-every-two-weeks limitation allows defendants to demonstrate often enough to communicate their message without subjecting the Murrays to a constant barrage of picketing. Finally, the duration limitation gives defendants plenty of time in which to convey their message each time they picket; in fact, at oral argument defendants conceded that they would not likely want to picket for more than one to one-and-one-half hours at a time anyway.

Finally, we note that as ACLU stated at oral argument, although the original injunction technically allowed more speech (it placed no limits on the number of picketers, or on the time and duration of the picketing), that speech was less effective because defendants were so far away from plaintiffs. The modified restrictions allow defendants to communicate their message much closer to where the object of their message would likely become aware of it, thereby presumably making that speech more effective.

## V

The judgment of the Appellate Division, 264 *N.J.Super.* 17, 624 *A.2d* 3, affirming the Chancery Division's permanent injunction prohibiting defendants from picketing within 300 feet of plaintiffs' residence is modified as set forth in this opinion. As modified the judgment is

Affirmed.

*For modification and affirmance*—Chief Justice WILENTZ, and Justices CLIFFORD, HANDLER, O'HERN, GARIBALDI and STEIN—6.

*Opposed*—None.