**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2595-18T3

AKIA LESTER and
BRUCE LESTER,

     Plaintiffs-Respondents,

v.

RAYMOND ZOLA and
CORNERSTONE II, LLC,

     Respondents-Appellants.

_____

Argued February 3, 2020 – Decided February 24, 2020

Before Judges Sabatino, Geiger and Natali.

On appeal from the Superior Court of New Jersey, Law Division, Gloucester County, Docket No. L-0432-18.

Jo-Leo Wade Carney-Waterton argued the cause for appellants.

Stephen Wayne Guice argued the cause for respondents.

PER CURIAM

Plaintiffs paid defendants, a car repair shop and its owner, to obtain and install a replacement engine for their car. After receiving plaintiffs' payment, defendant obtained a used engine from a supplier and placed it in plaintiffs' vehicle. The replacement engine quickly failed. Defendants did not repair or replace the engine. They claimed their warranty printed on the back of the customer's unsigned receipt did not cover the situation and that plaintiffs instead had to seek recourse from the engine supplier. Plaintiffs consequently sued defendants for relief under the Consumer Fraud Act, N.J.S.A. 56:8-1 to -198.

After a non-jury trial, the trial court ruled that defendants violated several consumer regulations. The violations included non-compliance with a regulation that requires material terms of a car repair warranty and the warrantor's identity and address to be specified in writing to the customer at the time of the transaction. The court awarded plaintiffs $3,500 in damages, trebled to $10,500, plus reasonable attorneys' fees.

Defendants appeal, principally contending that plaintiffs failed to prove the violations of the consumer regulations caused them a compensable "ascertainable loss." Defendants further contend the record should be reopened to admit evidence they uncovered concerning plaintiffs' disposition of the damaged car. For the reasons that follow, we affirm.

I.

The Factual Background

In December 2016, plaintiff Akia Lester, accompanied by her grandfather, co-plaintiff Bruce Lester, brought Akia's car, a 2012 Kia Sportage, to the Cornerstone II auto repair shop. The shop was owned and operated by defendant Raymond Zola.[1] Bruce Lester had a twenty-year relationship with Zola, who performed "oil changes and small things" for him at another service shop he owned.

Akia Lester complained of a "ticking sound" in the Kia and problems starting her engine. Zola testified there was "a hole the size of a softball . . . in the back of the engine" and told the Lesters they would need a replacement.

The parties reached an agreement on or about December 14, 2016 to replace the engine. Zola told the Lesters he had located a replacement engine and that the job would cost $3,500.[2] The Lesters paid defendants a $2,500 down payment on the engine.

The Lesters testified that it took about six weeks from the down payment until the engine was replaced. When they picked up the car, Zola apparently

---

[1] Zola testified that he dissolved the business in 2017.

[2] Bruce Lester testified that Zola orally agreed to reduce the price to $3,400.

A-2595-18T3

informed the Lesters that he was unable to secure the first selected replacement engine and could only find another engine that was slightly more expensive. Zola obtained the engine from a supplier named LKQ Penn-Mar, Inc. ("LKQ"). The name and address of LKQ as the engine supplier was not disclosed to plaintiffs.[3]

The Lesters testified that they paid $1,100 at the time they received the car, for a total cost of $3,600. Zola testified that they paid him a total of $3,500, a figure the trial court adopted.

Akia Lester testified that the only document she received from the repair shop was a receipt upon her making a final and full payment to Zola. She never received an itemized list of repairs with a listed price for each repair, and never signed any documents authorizing Zola to perform repair work on the car.

Zola submitted a "work order/receipt" for the replacement engine into evidence without objection. The receipt, dated December 14, 2016, named Bruce Lester as the recipient and described the job as an "engine replacement."

---

[3] Zola disputes the timing of this conversation, arguing the Lesters did not give him the deposit in time to buy one engine, which was then sold. He testified that he then found "an engine that was even better than the first" and the Lesters made their deposit on that second engine.

A-2595-18T3

It listed a $2,500 deposit for a new motor and $900 remaining on the balance.[4] There was no signature on the receipt. Zola acknowledged in his testimony that there was no signature, explaining that he did not attempt to get one because he had a long-standing informal relationship with Bruce Lester.

The Lesters each testified about alleged warranties on the engine. Bruce Lester stated that Zola told him there was a "one-year warranty" on the replacement motor, and that if they had any problems with the engine, they could take it back and have it replaced. He testified that this was an oral warranty, and that he trusted Zola based on their twenty-year relationship.

Akia Lester testified that when the Lesters paid for the engine, they were told there was a "one year or 10,000-mile" warranty on the engine issued by "whoever he got the engine from." She testified that, apart from a handwritten statement that there was a one-year warranty, with no details, she received no other information regarding the warranty, and no information about any third-party warranties. She did not recall seeing another warranty.

Zola testified at trial that there was a form warranty on the back side of the receipt for the purchased engine. The full text of the warranty is as follows:

Warranty Disclaimer Template

---

[4]  It listed $3,600 as the full, final price for the job.

Warranty

Thank you for your interest in the products and services of Corner Stone II.

This Limited Warranty applies to physical goods, and only for physical goods, purchased from Corner Stone II (the "Physical Goods".)

What does this limited warrant cover?

This Limited Warranty covers any defects in material or workmanship under normal use during the Warranty Period.

During the Warranty Period, Corner Stone II will repair or replace, at no charge, products or parts of a product that proves defective because of improper material or workmanship, under normal use and maintenance.

What will we do to correct problems?

Corner Stone II will either repair the Product at no charge, using new or refurbished replacement parts.

How long does that coverage last?
The Warranty Period for Physical Goods purchased from Corner Stone II is 180 days from the date of purchase.

A replacement Physical Good or part assumes the remaining warranty of the original Physical Good or 180 days from the date of replacement or repair, whichever is longer.

What does the limited warranty not cover?

A-2595-18T3

This Limited Warranty does not cover any problem that is caused by:

- conditions, malfunctions or damage not resulting from defects in material or workmanship

What do you have to do?

To obtain warranty service, you must first contact us to determine the problem and the most appropriate solution for you.

As noted above, the warranty states that it covers any "physical goods" that are "purchased from" Cornerstone II, lasts for 180 days from the date of replacement or repair, and warrants that "Cornerstone II will repair or replace, at no charge, products or parts that proves [sic] defective because of improper material or workmanship, under normal use and maintenance." The warranty document does not mention any third parties, or third-party warranties. During the trial, he appeared to agree that the warranty covered the purchased engine, although the defense's legal position disputes such coverage.[5]

According to the Lesters, when they agreed to the replacement, they were unaware that the engine would be procured from LKQ. They emphasized that

---

[5] When asked whether the engine was covered by Cornerstone's warranty, Zola stated, "It's covered under any physical goods through my warranty and [through] the people I bought the engine, LKQ, who Mr. Lester was well aware that I was doing through to get the engine." (emphasis added.)

A-2595-18T3

any warranties they received did not mention LKQ or other third parties. During the defense case, the trial judge questioned Zola on the stand and confirmed Zola told the Lesters that they would be receiving a used engine. Zola also acknowledged that the receipt and warranty he provided to the Lesters did not disclose that LKQ was the seller of the used engine and responsible for the warranty.

Zola admitted into evidence a copy of the receipt for the engine from LKQ under the business records hearsay exception. The receipt was for the sale of a used engine for $2,240. The receipt noted the buyer of the engine was "Corner Stone II" and that there was a "standard six month/6K [i.e., 6,000 mile] warranty" on the engine. The Lesters' names do not appear on the document.

Akia Lester testified that about a week after receiving the replacement engine, it began to make a "ticking" sound and "driving a little bit funny." She returned the car to Cornerstone II, and the car was evaluated again.

The only information the Lesters received for several weeks was that Zola was attempting to contact the company which had sold him the motor, and which had it under warranty. The Lesters both testified that Zola never disclosed to them at the time the name of the company that had sold him the engine.

Zola testified that he did not want to repair the engine himself because it allegedly would void the warranty with LKQ, and that he never received permission from LKQ to make a repair. He asserted that the engine was not defective but that it had a defective part, specifically a faulty "camshaft actuator" that was supposed to allow oil flow but did not, causing a "knocking" sound. Zola testified that he contacted LKQ and that an LKQ representative had visited his shop, but that there was "no time limit" to how long it might take to get a company like LKQ to honor the warranty and replace the second engine. Zola did not detail in his testimony what LKQ said or did during this time, or exactly how he tried to set it to honor the warranty.[6]

At some point, Zola allegedly told the Lesters he could not find an engine on the market because there was a recall in effect for various Kia models, including hers, and that the Lesters would need to take the car to a Kia dealership to resolve this engine problem. The Lesters thereafter visited a Kia dealership, and learned that the car was not part of the recall. After Akia Lester allegedly

---

[6] Before the defense case at trial began, Zola also attempted to submit a "warranty inspection report" allegedly provided by LKQ on January 7, 2019. The trial court declined to admit the document into evidence for several reasons. First, defendants had repeatedly failed to produce discovery and was submitting it for the first time after the close of the Lesters' case. Second, the court concluded the document was inadmissible hearsay. Defendants do not seek reversal of this evidential ruling.

conveyed this information to Zola, he apparently again told her the engine problem was Kia's responsibility. She took the car from Cornerstone II and took it to a Kia dealership, where she was told the replacement engine would need to be replaced.

According to the Lesters, Zola refused to replace the faulty replacement engine, or to refund their money at any time. Zola testified that he was willing to replace the second engine with the car's original (albeit faulty) engine while waiting for a response from LKQ.

The Lesters allege that the car with the faulty replacement engine could not drive more than ten miles per hour, and that Zola told them if they drove it faster the engine "could blow up or something like that." Akia Lester testified that she did not drive it after taking it to the Kia dealership, was unable to use the car, and eventually purchased a new vehicle in 2018.

The Trial Court's Rulings on the Merits

Following the close of their proofs, the Lesters moved for a directed verdict on the per se violations of the CFA regulations. The trial court concluded it was clear that the replacement engine was unusable, and that the Lesters had

paid Zola several thousand dollars but received "no meaningful use of their vehicle."[7]

The trial court noted that Zola conceded that he did not obtain a written signature authorizing the work before it began, as required by the regulations. The court also found the warranty provided to plaintiffs on the back of the receipt "does not make it clear that there was a third party that was weighing in," nor "what the terms of any warranty would be to a third party." The court noted that neither LKQ or Kia were named parties to the litigation and suggested that Zola should have impleaded them as third-party defendants because "his [Zola's] damage is caused by them supplying a defective engine."

The trial court concluded the purpose of the CFA regulations was "to prevent this type of confusion" through onerous disclosure requirements. The court found there were per se violations of the signature and warranty regulations. The court awarded the Lesters treble damages, with further proceedings to determine the extent of those damages.

---

[7] The trial court inappropriately relied upon Rule 4:40-1 in granting a partial "directed verdict" to plaintiffs on these issues at the close of plaintiffs' own case. That Rule only authorizes a motion by an opposing party, not the party that had presented a case-in-chief. In any event, this procedural deviation was inconsequential, as defendants thereafter did present their own evidence, and the trial court reaffirmed its decision upon hearing all the evidence. Moreover, the procedural deviation was not raised as an issue on appeal.

At the close of the defense case, the trial court reiterated these findings of per se violations of the CFA regulations. The court further noted that Zola had committed an unconscionable act by orally promising a one-year warranty for the repair of the vehicle, which he then disavowed.

The court found defendants had committed per se CFA violations of N.J.A.C. 13:45A-26C.2(a)(3(i)(2), for failure to "provid[e] the customer with a written estimated price quoted as a detailed breakdown of parts and labor necessary to complete the repair," and N.J.A.C. 13:45A-26C.2(a)(5), for "making deceptive or misleading statements or false promises of a character likely to influence, persuade or induce a customer."

The court concluded that, even accepting Zola's testimony as true, there was a six-month warranty on the engine based on the Cornerstone II document and that such a warranty was never honored. The court observed that a third-party warranty with LKQ through Cornerstone II would be acceptable had those terms been disclosed in writing to the Lesters. The absence of such advance written disclosure "went to the essence of the agreement of the parties." The court also found Zola's testimony about his efforts to contact LKQ "less than credible" and "self-contradicting."

The court determined that the Lesters had paid $3,500 to Zola for a replacement engine, and that this out-of-pocket expense was a clear "ascertainable loss" under the CFA. It concluded this loss was causally linked to Zola's failure to provide clear warranty terms, which would have established responsibility for the engine.

The court rejected the Lesters' other claimed expenses, including ongoing auto insurance and car payments. The court reasoned there was always an inherent risk that a car may break down, and that, regardless of the reason for a breakdown, these costs would have continued to accrue anyway.

Since the CFA requirements were met, the Lesters were awarded treble damages, or $10,500. The trial court also awarded plaintiffs a modified sum of $11,772.50 in counsel fees.

## II.

On appeal, defendants principally argue that plaintiffs failed to establish a causal connection between the "technical" violations of the consumer regulations and their claimed damages. Defendants further contend plaintiffs failed to prove an "ascertainable loss" as required to collect damages under the CFA. Lastly, defendants argue that this court should consider newly discovered

13

evidence they have marshalled concerning the vehicle, which allegedly disproves plaintiffs' contentions about the financial loss they claimed.

We consider defendants' arguments guided by well-settled principles of appellate review applicable to non-jury trials. An appellate court shall "'not disturb the factual findings and legal conclusions of the trial judge unless [it is] convinced that they are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice[.]'" Seidman v. Clifton Sav. Bank, 205 N.J. 150, 169 (2011) (quoting In re Trust Created by Agreement Dated December 20, 1961, 194 N.J. 276, 284 (2008)); Rova Farms Resort, Inc. v. Investors Ins. Co. of Am., 65 N.J. 474, 484 (1974). To the extent a trial judge's decision implicates legal principles, we independently evaluate those legal assessments de novo. See Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995); Finderne Mgmt. Co. v. Barrett, 402 N.J. Super. 546, 573 (App. Div. 2008).

The applicable substantive law is clear. The CFA makes the following acts unlawful, in connection with sale or advertisement of merchandise or real estate:

> The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any

14

material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice.

[N.J.S.A. 56:8-2.]

As used in the statute, "[t]he term 'merchandise' shall include any objects, wares, goods, commodities, services or anything offered, directly or indirectly to the public for sale." N.J.S.A. 56:8-1(c).

Violations of the CFA can arise under three different categories: (1) "[a]n affirmative misrepresentation, even if unaccompanied by knowledge of its falsity or an intention to deceive"; (2) "[a]n omission or failure to disclose a material fact, if accompanied by knowledge and intent"; and (3) "'violations of specific regulations promulgated under the [CFA],'" which are reviewed under strict liability. Monogram Credit Card Bank of Georgia v. Tennesen, 390 N.J. Super. 123, 133 (App. Div. 2007) (citations omitted). "To fully advance the Act's remedial purposes, courts construe its provisions broadly and liberally in favor of consumers." Heyert v. Taddese, 431 N.J. Super. 388, 411 (App. Div. 2013).

The CFA allows private causes of action in instances where a plaintiff can establish each of three elements: (1) unlawful conduct by the defendant; (2) an ascertainable loss on the part of the plaintiff; and (3) a causal relationship between the defendant's unlawful conduct and the plaintiff's ascertainable loss. Dabush v. Mercedes-Benz USA, LLC, 378 N.J. Super. 105, 114 (App. Div. 2005) (citing N.J. Citizen Action v. Schering-Plough Corp., 367 N.J. Super. 8, 12-13 (App. Div. 2003).

Defendants concede in their appellate brief that they violated sections of N.J.A.C. 13:45A-26C.2, within the automotive repair regulations promulgated under the CFA. Specifically, they concede a violation of N.J.A.C. 13:45A-26C.2(a)(2)(i), which prohibits:

> Commencing work for compensation without securing one of the following . . . Specific written authorization from the customer, signed by the customer, which states the nature of the repair requested or problem presented and the odometer reading of the vehicle.
>
> [N.J.A.C. 13:45A-26C.2(a)(a)(i) (emphasis added).]

Defendants also admit a violation of N.J.A.C. 13:45A-26C.2(a)(9), which declares unlawful:

> The failure to deliver to the customer, with the invoice, a legible written copy of all guarantees, itemizing the parts, components and labor represented to be covered by such guaranty, or in the alternative, delivery to the

16

customer of a guaranty covering all parts, components and labor supplied pursuant to a particular repair order. A guaranty shall be deemed false and misleading unless it conspicuously and clearly discloses in writing the following:

i. The nature and extent of the guaranty including a description of all parts, characteristics or properties covered by or excluded from the guaranty, the duration of the guaranty and what must be done by a claimant before the guarantor will fulfill his obligation (such as returning the product and paying service or labor charges);

ii. The manner in which the guarantor will perform. The guarantor shall state all conditions and limitations and exactly what the guarantor will do under the guaranty, such as repair, replacement or refund. If the guarantor or recipient has an option as to what may satisfy the guaranty, this must be clearly stated;

iii. The guarantor's identity and address shall be clearly revealed in any documents evidencing the guaranty.

[N.J.A.C. 13:45A-26C.2(a)(9) (Emphasis added).]

A defendant is strictly liable for violations of the CFA's regulations, regardless of whether it acted in good faith. Scibek v. Longette, 339 N.J. Super. 72, 80 (App. Div. 2001) ("Even actions taken in good faith may subject the person violating the regulatory provisions to liability for consumer fraud."). A plaintiff does not need to have actually relied on a defendant's unlawful practice to establish liability under the statute. See Lee v. Carter-Reed Co., 203 N.J. 496,

522 (2010) (noting the CFA "essentially replaces reliance" with proof of any ascertainable loss caused by the unlawful act).

If a plaintiff adequately pleads ascertainable loss, he or she may recover attorney's fees and costs even if he or she ultimately fails to prove that loss at trial. See Weinberg v. Sprint Corp., 173 N.J. 233, 253 (2002) (awarding attorney's fees and costs so long as a plaintiff raises a "bona fide claim of ascertainable loss that raises a genuine issue of fact requiring resolution by the factfinder"); Defendants are therefore liable for the Lesters' reasonable counsel fees and costs, even if, hypothetically, the Lesters had been unable to show causation and ascertainable loss at trial.

Turning to the disputed question of causation, defendants on appeal contend that it should have been obvious to plaintiffs that the Cornerstone II warranty printed on the back of the form receipt did not cover defects in the replacement engine and that oral representations that the engine was provided by a third party were sufficient notice to plaintiffs of those terms. The trial court was not persuaded by this contention, and neither are we.

We reject defendants' argument that a reasonable consumer in plaintiffs' shoes would understand that the form warranty's phrase "physical goods, purchased from Cornerstone II" would not apply to the replacement engine

defendant obtained and installed in their car. Plaintiffs paid defendants for both the engine and the labor involved in installing it. The engine was already part of the transaction. In fact, defendants' crabbed interpretation of the warranty is contradicted by the provision in which Cornerstone II promised to "repair or replace, at no charge, products or parts if a product that proves defective because of improper material or workmanship . . . ." (Emphasis added).

Moreover, the duration of the warranty for a "replacement physical good or part assumes the remaining warranty of the original Physical Good or 180 days from the date of replacement or repair, which is longer." (Emphasis added). This latter provision further illustrates that defendants' warranty reasonably would have been understood to cover more than physical goods, if any, fabricated by the repair shop, but also would cover goods and replacement goods the shop obtained from third-party suppliers.

In any event, defendants' own warranty was not honored, and plaintiffs were clearly deprived of its promised benefits. This alone is a violation of the CFA's statutory prohibition on deceptive practices in the sale of merchandise, N.J.S.A. 56:8-2, and of N.J.A.C. 13:45A-26C.2(a)(5) ("Making deceptive or misleading statements or false promises of a character likely to influence,

persuade or induce a customer to authorize the repair, service or maintenance of a motor vehicle.").

Defendants claim that plaintiffs' sole recourse should have been through the warranty set forth in LKQ's invoice form. The trial court soundly rejected that contention. The LKQ warranty was never given to plaintiffs at the time of their transaction and payment to defendants. The LKQ form makes no mention of plaintiffs. Plaintiffs had a reasonable basis to expect satisfaction from the repair shop they dealt with, and not from some unidentified vendor. To the extent defendants argue they attempted to make LKQ honor its warranty, the trial court found Zola's testimony not credible, and we see no basis to challenge that finding here. See Rova Farms, 65 N.J. at 484 ("Findings by the trial judge are considered binding on appeal when supported by adequate, substantial and credible evidence.").

Plaintiffs presented more than significant evidence of causation. But for defendants' non-compliance with the consumer laws, plaintiffs might have declined to go forward with the transaction if they knew some third-party supplier, and not defendants—who Bruce Lester had dealt with for many years—would be the actual guarantor of any defects with the engine. The terms of the warranty and the identity of the guarantor were material aspects of the

transaction. As the trial judge aptly recognized, this is precisely why the regulations exist: to provide a customer with important information before making a payment and proceeding with the transaction.

We are also satisfied that plaintiffs presented sufficient evidence of a compensable "ascertainable loss." In Thiedmann v. Mercedes-Benz USA, LLC, 138 N.J. 234, 238 (2005), the Supreme Court explained that the element of ascertainable loss under the CFA may be established by "either out-of-pocket loss or as a demonstration of loss in value" in cases of breach of contract or misrepresentation. (Emphasis added). Here, the Lesters clearly sustained an out-of-pocket loss of $3,500 for the money they paid defendants for the engine replacement. That sum was never refunded to them after the engine failed. The judge did not err in awarding that amount, given the credible trial testimony that plaintiffs presented.

We reject defendants' belated attempt to undo the final judgment with supplemental documents allegedly reflecting that plaintiff Akia Lester was paid money by her insurer for the loss of the car. Although such evidence arguably is relevant to plaintiffs' credibility about the disposition of the car and mitigation of damages, defendants have failed to demonstrate why such evidence could not have been obtained through the exercise of due diligence, pre-trial, during the

21

discovery period. The pendency of defendants' motion to dismiss the amended complaint is no excuse for not timely exchanging all discovery during the prescribed period.

"To obtain relief from a judgment based on newly discovered evidence, the party seeking relief must demonstrate 'that the evidence would probably have changed the result, that it was <u>unobtainable by the exercise of due diligence</u> for use at the trial, and that the evidence was not merely cumulative.'" <u>DEG, LLC v. Twp. of Fairfield</u>, 198 N.J. 242, 264 (2009) (<u>quoting</u> <u>Quick Chek Food Stores v. Twp. of Springfield</u>, 83 N.J. 438, 445 (1980)) (emphasis added). These requirements are not met here. The supplemental proofs are simply too little and too late.

We have considered all remaining points and sub-points presented by defendants, and conclude they lack sufficient merit to warrant discussion. <u>R.</u> 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2595-18T3